T.C. Memo. 2011-51


UNITED STATES TAX COURT


JEFFREY S. AND MARY F. CHARLTON, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 19599-07, 19600-07,    Filed March 1, 2011.
          19601-07, 19602-07,
          19603-07, 19604-07,
          19605-07.


Harry Charles, for petitioners.

James A. Kutten and Stephen A. Haller, for respondent.


---

[1]Cases of the following petitioners are consolidated herewith:  Graphic Connections Group, LLC, Jeffrey S. Charlton, Tax Matters Partner, docket Nos. 19600-07 and 19601-07; Wealth Builders International, LLC, Jeffrey S. Charlton, Tax Matters Partner, docket Nos. 19602-07 and 19603-07; Golf Links Display Group, LLC, Jeffrey S. Charlton, Tax Matters Partner, docket Nos. 19604-07 and 19605-07.

MEMORANDUM FINDINGS OF FACT AND OPINION

FOLEY, Judge:  After concessions, the issues for decision are whether respondent issued petitioners an affected items notice of deficiency (notice) and notices of final partnership administrative adjustments (FPAAs) within the applicable limitations periods, and if so, whether petitioners are liable for deficiencies and fraud penalties.

FINDINGS OF FACT

In 1985, Jeffrey Charlton graduated from the University of Missouri with a degree in civil engineering.  After college, he worked for 3 years as an industrial engineer for Proctor & Gamble and then began work as a salesman for his father-in-law's printing business.  In 1992, Jeffrey and his brother, Timothy Charlton, started their own printing business, Graphic Connections, Inc.  Jeffrey and Timothy hired Charles Moore, a certified public accountant (CPA) with a bachelor's degree in accounting and a master's degree in business administration, to prepare their individual returns and Graphic Connections, Inc.'s corporate returns.

Throughout his career, Jeffrey pursued a myriad of income-producing opportunities.  His desire to earn large amounts of income with minimal effort led him to become involved with Amway, Herbalife, and numerous other multilevel marketing businesses (MLM).  These endeavors were unsuccessful.  In 1997, Jeffrey,

continuing his fervent quest for easy money, wrote and published a book titled The Ultimate International Wealth Building System. In the book, Jeffrey explained how to get out of debt, make and invest money, reduce taxes, and protect assets. Jeffrey compiled this information from sources on the Internet and from his experiences. Jeffrey also created Wealth Builders International, an MLM that promoted his International Wealth Building System and combined his book, MLMs, and mail orders into one system. Customers paid Jeffrey upon purchasing a book or joining an MLM listed in the book.

In 1997, Jeffrey and Timothy traveled to Phoenix, Arizona, to meet with representatives of ProTec Services (ProTec), a company that promoted trusts designed to protect assets and reduce tax liability (ProTec plan). During the meeting, ProTec representatives explained the ProTec plan and assured Jeffrey and Timothy that it was a legitimate planning technique.[2] On October 10, 1997, Jeffrey and Timothy executed an installment agreement to pay ProTec $27,940 for a variety of services. These services included the initial setup of the ProTec plan and two trusts, Token International Trust (Token Trust) and Titan International

---

[2]Representatives of ProTec routinely told potential clients that the Internal Revenue Service had verified that the ProTec plan complied with tax laws. In 2004, certain representatives of ProTec pleaded guilty to a charge of conspiracy to defraud the United States in connection with their activities related to the promotion and marketing of fraudulent trust schemes.

Trust (Titan Trust) (collectively, the domestic trusts), to implement the ProTec plan.

In 1998, prior to implementing the ProTec plan, Jeffrey and Timothy were informed that ProTec had ceased operations. Jeffrey immediately searched for another company promoting a similar system and found the Aegis Co. (Aegis). In August 1998, Jeffrey contacted William Cover, a manager and promoter of Aegis, to inquire about becoming an Aegis member.

Jeffrey and Timothy highly valued Mr. Moore's professional judgment and, in October 1998, invited Mr. Moore to accompany them to an Aegis seminar in Chicago, Illinois (Aegis seminar), to evaluate the legitimacy of the Aegis trust system (Aegis system) and to question Aegis representatives. During the Aegis seminar, Aegis representatives explained the Aegis system's use of business trusts to reduce income tax liability and protect assets. Aegis representatives readily acknowledged the possibility of Internal Revenue Service (IRS) audits but assured seminar participants of the Aegis system's legitimacy and Aegis' ability to successfully navigate clients through IRS audits.

Jeffrey, Timothy, and Mr. Moore left the Aegis seminar convinced that the Aegis system was a legitimate tax minimization and asset protection plan. Mr. Moore expressed his support for the Aegis system and informed Jeffrey and Timothy that the system appeared to be thorough and in compliance with relevant tax

rules. Jeffrey and Timothy proceeded to use Aegis' customized forms and instructions to implement the Aegis system. Pursuant to the Aegis system, each brother's wife conveyed all of her lifetime services to her husband. Jeffrey and Timothy each then transferred all of their respective real property, personal property, and lifetime services to Token Trust and Titan Trust, respectively. The domestic trusts' beneficial interests were then transferred to offshore trusts in Belize (Belize trusts).

During 1998, Jeffrey and Timothy formed Graphic Connections Group, LLC; Wealth Builders International, LLC; and Golf Links Display Group, LLC (collectively, the partnerships). Pursuant to the partnerships' operating agreements, Jeffrey and Timothy each had a 1-percent interest, and the domestic trusts had a 98-percent interest, in each of the partnerships. The domestic trusts paid the personal expenses of Jeffrey's and Timothy's families and distributed income to the Belize trusts. Jeffrey and Timothy used foreign bank accounts in Belize and Antigua to access the income. On August 1, 1999, Token Trust purchased Titan Trust's and Timothy's interests in the partnerships.

On April 6, 2000, Michael Vallone, the executive director and a founder of Aegis, sent Jeffrey a letter (April 2000 letter) in which Mr. Vallone provided Jeffrey with audit defense strategies, advised Jeffrey to retain certain attorneys, and

assured Jeffrey that Aegis was using "inside information" from the IRS to successfully counter IRS audits.

In 1999 and 2000 (years in issue), Jeffrey sold, through direct mail solicitations, over 40,000 copies of his book. During the years in issue, Jeffrey and Timothy maintained ledgers of income and expenses relating to their respective trusts and provided these ledgers to Mr. Moore to assist him in preparing the domestic trusts' returns. Using the ledgers and the advice of Aegis' trust expert, Mr. Cover, Mr. Moore prepared and signed Jeffrey's, Timothy's, the partnerships', and the domestic trusts' returns relating to the years in issue. Jeffrey, as the partnerships' tax matters partner, signed each of the partnership returns relating to the years in issue. Minimal liability was reported on the individual, partnership, and trust returns relating to the years in issue.[3] After the filing of these returns, Mr. Moore, on July 15, 2001, became trustee of Jeffrey's trust (i.e., Token Trust).

On January 8, 2002, respondent mailed Jeffrey and his wife, Mary Charlton, a preliminary notice (i.e., relating to 1998, 1999, and 2000) in which respondent asserted that Jeffrey and

[3]On Oct. 15, 2000, the partnerships each filed Forms 1065, U.S. Partnership Return of Income, relating to 1999. On Oct. 17, 2000, Jeffrey and Timothy each filed 1999 joint Federal income tax returns with their respective wives. On July 8, 2001, Jeffrey and his wife, Mary Charlton, filed a 2000 joint Federal income tax return. On July 11, 2001, the partnerships filed Forms 1065, U.S. Return of Partnership Income, relating to 2000.

Mary's trust arrangement was abusive and used for tax avoidance purposes. On January 22, 2002, Scott Gross, Jeffrey and Mary's attorney who had been recommended by Aegis, sent respondent a letter in response to the preliminary notice. In the letter, Mr. Gross, following the Aegis audit strategy and citing legal precedent set forth in the April 2000 letter, requested "clarification as to how your Privacy Act Notice applies to your request to examine" certain information delineated in the preliminary notice.

On January 30, 2002, Jeffrey sought Mr. Moore's advice regarding the appropriate course of action and informed Mr. Moore that, consistent with Mr. Cover's and Mr. Gross' recommendations, Jeffrey planned to refuse to cooperate with IRS auditors and would establish in the Tax Court the legitimacy of the Aegis system. Mr. Moore's responses to Jeffrey's inquiries were ambiguous.

On March 11, 2002, respondent mailed each of the partnerships a notice of beginning of administrative proceeding relating to 1999 and 2000.[4] Soon thereafter, respondent issued administrative summonses (i.e., relating to certain records, documents, and testimony) to Jeffrey; Timothy; Graphic Connections, Inc.; and the partnerships. At the direction of

---

[4]On Oct. 7, 2002, respondent mailed each partnership a second notice of beginning of administrative proceeding relating to 1999 and 2000.

Aegis and Mr. Gross, Jeffrey and Timothy resisted respondent's summonses; transferred the trusts' records to newly appointed trustees; and, using forms prepared by Aegis, filed criminal complaints against IRS employees involved in the audit.

In May 2002, the IRS Chief Counsel filed with the U.S. District Court for the Eastern District of Missouri (District Court) civil actions against Jeffrey and Timothy to enforce the summonses, and in February 2003, the District Court found Jeffrey and Timothy in contempt of court for failing to fully comply with the summonses. In March 2003, Jeffrey and Timothy complied with the IRS' summonses, and the District Court dismissed the summons enforcement actions.

On June 19, 2007, respondent issued Jeffrey and Mary the notice relating to 1999 and 2000. In the notice, respondent determined that, in accordance with an examination of Token Trust, income and expenses of Token Trust relating to the years in issue were attributable to Jeffrey and therefore should have been reflected on his individual returns relating to those years. As a result, respondent determined that Jeffrey and Mary were liable for deficiencies in tax and section 6663(a)[5] fraud penalties relating to the years in issue.

---

[5]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

On June 20, 2007, respondent issued each of the partnerships an FPAA relating to 1999 and an FPAA relating to 2000.  In the FPAAs, respondent made adjustments and imposed fraud penalties in accordance with the determinations that the domestic trusts were sham entities and should be disregarded and that the domestic trusts' interests in the partnerships should be reallocated to Jeffrey and Timothy.

On August 29, 2007, Jeffrey and Mary, while residing in Missouri, filed their petition with the Court.  That same day, Jeffrey, as tax matters partner for the partnerships, filed petitions seeking readjustment of respondent's FPAAs.  On December 10, 2007, the Court filed respondent's motion to dismiss and strike as to certain partnership and affected items relating to 1999.  The Court, on December 17, 2007, granted respondent's motion.

On May 19, 2008, Mr. Vallone, Mr. Cover, and four other principals of Aegis were convicted of conspiracy to defraud the United States in connection with their activities related to the promotion and marketing of fraudulent trust schemes.

                              OPINION

Section 6501(a) provides that, generally, the amount of any tax must be assessed within 3 years of the filing of a return. If, however, a taxpayer files a false or fraudulent return with the intent to evade tax, the tax may be assessed at any time.

Sec. 6501(c)(1). Similarly, section 6229(a) provides that, generally, the amount of any tax with respect to any person which is attributable to a partnership item or an affected item relating to a partnership taxable year must be assessed within 3 years after the later of the date the partnership return is filed or the last day for filing the return. See also sec. 6501(n)(2). If, however, any partner has, with the intent to evade tax, signed or participated directly or indirectly in the preparation of a partnership return which includes a false or fraudulent item, the tax may be assessed at any time. Sec. 6229(c)(1).

Respondent contends that the period to assess Jeffrey and Mary's 2000 tax liability is open because Jeffrey and Mary's underpayment of tax is due to fraud and thus is not subject to the 3-year limitation period. See sec. 6501(c)(1). Respondent also contends that the FPAAs were timely because the partnerships' returns were false or fraudulent and thus not subject to the applicable 3-year limitation period. See sec. 6229(c)(1). Respondent must establish by clear and convincing evidence that Jeffrey and Mary filed false or fraudulent returns with the intent to evade tax. See sec. 7454(a); Rule 142(b); Botwinik Bros. of Mass., Inc. v. Commissioner, 39 T.C. 988, 996 (1963). This burden is met where respondent proves that the taxpayer intended to evade taxes known to be owing by conduct

intended to conceal, mislead, or otherwise prevent the collection of taxes.  See Parks v. Commissioner, 94 T.C. 654, 661 (1990).

Simply put, respondent has failed to meet his burden.  See Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989) (providing that the existence of fraud may not be found under "'circumstances which at the most create only suspicion.'" (quoting Davis v. Commissioner, 184 F.2d 86, 87 (10th Cir. 1950), remanding a Memorandum Opinion of this Court)); Beaver v. Commissioner, 55 T.C. 85, 92 (1970).  To the contrary, Jeffrey did not intend to evade tax but wrongfully believed that the ProTec plan and the Aegis system were legitimate tax avoidance techniques.  Indeed, Jeffrey, Timothy, and Mr. Moore all believed that the Aegis system was legitimate and that the returns were accurate.  See Gajewski v. Commissioner, 67 T.C. 181, 199 (1976) (stating that the existence of fraud is a question of fact to be determined upon consideration of the entire record), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).  Mr. Moore, respondent's primary witness, provided convincing testimony regarding the perceived legitimacy of the techniques and accuracy of the returns.  His testimony relating to his advice to Jeffrey and Timothy, however, was inconsistent, incoherent, and at times incomprehensible.  Nevertheless, Jeffrey, through his credible testimony, established that Mr. Moore did not express any doubt regarding the legitimacy of the tax planning arrangements.  In

fact, Mr. Moore was so comfortable with the tax planning arrangements that, after preparing the domestic trusts' returns relating to the years in issue, he became a trustee of Jeffrey's domestic trust (i.e., Token Trust).

Jeffrey, who undoubtedly had a penchant for fast and easy money, foolhardily followed the Aegis system (i.e., structuring the transactions and resisting the IRS audit). See Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992); Gajewski v. Commissioner, supra. Nevertheless, Jeffrey maintained adequate records and made all pertinent information available to Mr. Moore, his longtime trusted, yet imprudent, CPA. See Niedringhaus v. Commissioner, supra at 211. To his detriment, Jeffrey relied on the professional judgment of Mr. Moore, who inexplicably believed in and acquiesced to an elaborate scheme designed by con artists. See Estate of Temple v. Commissioner, 67 T.C. 143, 162 (1976) (holding that reliance upon an accountant to prepare accurate returns may negate fraudulent intent if the accountant was supplied with all the information necessary to prepare the returns); Marinzulich v. Commissioner, 31 T.C. 487, 490 (1958) (holding that a taxpayer's reliance upon his accountant to prepare an accurate return may indicate an absence of fraudulent intent).

Accordingly, the extended limitations periods set forth in sections 6501(c)(1) and 6229(c) are not applicable, and

respondent's determinations and adjustments relating to 1999 and 2000 are barred.

Contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Decisions will be entered for petitioners</u>.