T.C. Memo. 2013-176

UNITED STATES TAX COURT

LAURA R. AMES-MECHELKE, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos.  4058-03, 20447-03,        Filed August 1, 2013.
              20448-03.

<u>Joe Alfred Izen, Jr.</u>, for petitioner.

<u>Steven Wendell LaBounty</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  In these consolidated cases respondent issued three notices

of deficiency determining the following deficiencies in petitioner's Federal

income tax and section 6662(a)[1] accuracy-related penalties:

---

[1]Unless otherwise indicated, all section references are to the Internal

(continued...)

| [*2] Year | Deficiency | Penalty sec. 6662(a) |
|---|---|---|
| 1993 | $15,577 | $3,115.40 |
| 1994 | 52,833 | 10,566.60 |
| 1995 | 61,586 | 12,317.20 |
| 1996 | 84,906 | 16,981.00 |
| 1997 | 86,105 | 17,221.00 |

In the notices of deficiency respondent determined that certain trust arrangements petitioner had used during the years in issue were shams and should be disregarded for Federal tax purposes.  Consequently, respondent determined that petitioner was required to include in income amounts purportedly transferred to the trusts.  The parties have stipulated that petitioner's trust arrangements may be treated as shams for Federal tax purposes.  In addition, except for her theft loss claim, petitioner has conceded the calculations of income, deductions, and credits for the years in issue as determined in the notices of deficiency.  Thus, the remaining issues for decision are whether respondent issued petitioner a notice of deficiency for each year in issue within the applicable limitations period, and if so,

----

[1](...continued)
Revenue Code of 1986, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[*3]** whether petitioner is liable for the section 6662(a) accuracy-related penalties determined therein. Petitioner also asks the Court to decide whether she is entitled to deduct a theft loss under section 165(a) for the amounts she paid to the abusive trust promoter during the years in issue.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner resided in Missouri when her petition was filed.

I. Tax Year 1993

In 1985 petitioner received her chiropractic license and began work as a chiropractor through her sole proprietorship, Chiropractic Care Center (Chiropractic Care). As a chiropractor petitioner has always practiced in Effingham, Illinois.[2]

In 1993 petitioner met Paul E. Palmer, a.k.a. Gene Palmer, through Palmer's wife, a patient of petitioner. Upon sharing her concerns about her income tax liabilities, petitioner met with Palmer as a financial planner. When Palmer also

_____

[2]According to her income tax returns, petitioner's address for the first two years in issue, 1993 and 1994, was also in Effingham, Illinois. Her address for the remaining years in issue was in Webster Groves, Missouri, a suburb of St. Louis.

[*4] claimed to be a minister, petitioner later met with him as a minister and attended  his charismatic prayer studies.

In addition to his prayer studies, Palmer met with petitioner to discuss a purportedly legal way of reducing her taxes using trusts.[3]  He offered her videos and books describing the trust arrangement.  To reassure petitioner that the trusts were legitimate, Palmer introduced her to a tax return preparer, Dwight Dennis Larson.  Petitioner did not realize that Larson did not have an accounting degree but was aware that Larson had been a tax return preparer since 1971.

Larson had become involved with Palmer through a trust arrangement purchased by one of his clients.  Larson understood that the main object of Palmer's trust arrangement was tax avoidance.  Palmer had explained to Larson how the trusts operated and eventually convinced him that the trust arrangement was legal so long as the taxpayer did not have control of the money transferred to the trusts.  Over the course of time he also grew to understand that Palmer had "sneaky" ways of returning trust funds to the taxpayer without the funds "showing up".

---

[3]The Court's use of "trust" is for convenience only and is not intended to impart any legal significance with respect to the characterization for Federal tax purposes.

**[*5]**   Larson began to provide tax advice to taxpayers who purchased Palmer's trust arrangement.  Larson met with petitioner to provide tax advice and to answer her questions about the trusts.  He also attended meetings with petitioner and Palmer to learn how to transfer money to and among the trusts.  Larson allegedly understood the accounting aspects of the trusts, but he did not understand how the money was actually transferred.

After studying Palmer's books and materials and watching his videos, petitioner was eventually convinced that Palmer's trust arrangement was legitimate, and she decided to purchase it.  Petitioner hired Larson to prepare her personal return, then extended the engagement to include corporate and trust returns, during the years in issue.

In November 1993 petitioner purchased her first trust arrangement from Palmer.  She paid Palmer an initial fee of $30,000 for his purported financial planning services, plus $46,000 for four trust documents, two of which cost $11,000 each and the other two $12,000 each.  Petitioner signed four checks drawn from Chiropractic Care's bank account totaling $46,000 and payable to Palmer's entities, Affluence Management Systems Trust and Specialty Management Systems Trust.  At the recommendation of Palmer and Larson, petitioner incorporated Chiropractic Care, changing the form of the entity from a

[*6] sole proprietorship to a C corporation called Optimum Health Care, Ltd. (Optimum Health), in Illinois. Petitioner was Optimum Health's sole shareholder and was responsible for its operations.

In December 1993 petitioner used Palmer's customized forms and instructions to implement his trust arrangement. The trust documents, which were dated variously from September 1992 to May 1993, formed four trusts: Jupiter Consultants (Jupiter), Calypso Leasing Co. (Calypso), Peaceful Vistas Management (Peaceful Vistas), and Euphoria Equities. Petitioner executed the trust documents without completely reading them. Petitioner did not remember applying for taxpayer ID numbers, and respondent did not receive taxpayer ID number applications for the trusts or assign ID numbers to them. Nonetheless, Palmer opened domestic bank accounts on petitioner's behalf for each of the trusts, and, without petitioner's knowledge, used false taxpayer ID numbers. Palmer and petitioner were signatories on the accounts. According to petitioner, Palmer never exercised control over these bank accounts, and petitioner authorized all withdrawals and checks from them.

Larson prepared petitioner's tax return for 1993, which was timely filed on April 15, 1994. On the Schedule C, Profit or Loss From Business, attached to petitioner's return, Larson deducted the $46,000 of trust payments as cost of sales

[*7] and as contract services for Chiropractic Care. Petitioner reported a net profit of $102,773, from her chiropractic business and total personal income tax due of $24,938. Jupiter, Calypso, Peaceful Vistas, and Euphoria Equities did not file tax returns for 1993.

II. Tax Years 1994 and 1995

During 1994 and 1995 petitioner transferred taxable income from Optimum Health to her trusts through a series of transactions Palmer arranged. In each year, petitioner transferred a total of $144,000 from Optimum Health to three of her trusts, Jupiter, Calypso, and Peaceful Vistas. She then transferred the $144,000 of trust funds to Euphoria Equities and used the funds to pay her credit card bills, mortgage, and other personal living expenses. In addition, petitioner, on behalf of Optimum Health, made payments to Palmer and his entities during 1994 and 1995. In 1994 petitioner paid $10,000 to Palmer's entity Specialty Management Systems, and in 1995 she paid $3,000 to Palmer individually and $15,000 to his entity Eagle Resources.

Larson prepared Optimum Health's Form 1120, U.S. Corporation Income Tax Return, for its fiscal years ending on November 30, 1994 and 1995.[4] On the

---

[4]On May 1, 1998, Optimum Health was involuntarily dissolved under Illinois law for failing to file an annual report. On November 7, 2005, respondent

(continued...)

[*8] returns Larson deducted Optimum Health's trust payments from its taxable income as section 162 business expenses. To characterize the trust payments, Larson relied on Optimum Health's books and records, which he prepared using check stubs or by conferring with petitioner and Palmer. Larson deducted the trust payments using the following descriptions:

| Trust | Expense | Tax year | |
|-------|---------|----------|---|
| | | 1994 | 1995 |
| Jupiter | Cost of sales | $48,000 | $48,000 |
| Calypso | Rent | 44,000 | 48,000 |
| | Cost of sales | 4,000 | -- |
| Peaceful Vistas | Management fees | 48,000 | 44,000 |
| | Rent | -- | 4,000 |
| | | 144,000 | 144,000 |

Larson also deducted Optimum Health's payments to Palmer and his entities as follows: (1) for 1994, $10,000 to Specialty Management Systems as a

[4](...continued)
issued Optimum Health a notice of deficiency, and a petition was timely filed with the Court seeking a redetermination. On January 7, 2009, the petition was dismissed for lack of jurisdiction because it was not signed by Optimum Health or by a party with proper authorization and capacity on Optimum Health's behalf. See Optimum Health Care, Ltd. v. Commissioner, T.C. Dkt. No. 3128-06 (Jan. 7, 2009).

**[\*9]** management fee and (2) for 1995, $3,000 to Palmer individually as dues and subscriptions and $15,000 to Eagle Resources as cost of sales.

For fiscal years ending November 30, 1994 and 1995, Optimum Health reported gross receipts of $362,035 and $428,527, respectively. After deducting, inter alia, payments to petitioner's trusts and to Palmer and his entities, Optimum Health reported taxable income of $16,635 and $27,542 for 1994 and 1995, respectively. Petitioner's trusts, Jupiter, Calypso, Peaceful Vistas, and Euphoria Equities, did not file returns for 1994 and 1995.

Larson also prepared petitioner's individual tax returns for 1994 and 1995, which were timely filed on April 15, 1995 and 1996, respectively. Larson did not include Optimum Health's trust payments as income on petitioner's returns for 1994 and 1995.

III. Tax Years 1996 and 1997

Toward the end of 1995 Larson suggested to petitioner that she switch from Palmer's trust arrangements to trusts offered by the Aegis Co. (Aegis), an entity that promoted domestic and foreign trust packages.[5] When petitioner approached

---

[5]In 2008 principals of Aegis were convicted of conspiracy to defraud the United States in connection with their activities related to the promotion and marketing of fraudulent trust schemes. See, e.g., Charlton v. Commissioner, T.C. Memo. 2011-51.

[*10] Palmer about the Aegis trusts, he offered her the same trust arrangement but cheaper. In December 1995 petitioner adopted the new trust arrangement from Palmer, which she used for tax years 1996 and 1997.

Pursuant to the new trust arrangement, petitioner operated her chiropractic business through a business trust, Optimum Health Care Trust (Optimum Health Trust). Petitioner then transferred Optimum Health Trust's business receipts, which were deposited in a domestic bank account in Effingham, Illinois, to accounts outside the United States through a series of transactions Palmer arranged.

Petitioner transferred Optimum Health Trust's income to its beneficiary, Euphoria Equities,[6] which also had a domestic bank account in Effingham, Illinois. Petitioner transferred Euphoria Equities' trust income outside the United States to Tri-Global Management, Inc., and then to Vanstar Enterprises, Ltd., both of which were purportedly incorporated in the Bahamas and had foreign bank accounts in St. Johns, Antigua. After moving the trust income to foreign bank accounts, petitioner finally returned her trust income to the United States, where

---

[6]At trial petitioner testified that she did not know whether the Euphoria Equities in her first trust arrangement was the Euphoria Equities in her second trust arrangement. In the second trust arrangement Euphoria Equities reported two addresses on its tax returns, one in Effingham, Illinois, and the other in the Bahamas.

[*11] she deposited it in a bank account in Effingham, Illinois, for New Covenant Trust, a beneficiary of Euphoria Equities. Petitioner used the New Covenant Trust funds as her own to pay bills and other personal living expenses.

Larson prepared Optimum Health Trust's Forms 1041, U.S. Income Tax Return for Estates and Trusts, for 1996 and 1997. Attached to each trust return was a Schedule C for petitioner's chiropractic business reporting gross receipts of $434,246 and $509,195 for 1996 and 1997, respectively, and a net profit of $205,173 and $222,819, respectively. Each trust return also included a Schedule K-1, Beneficiary's Share of Income, Deductions, Credits, etc., for Optimum Health Trust's beneficiary, Euphoria Equities. The Schedules K-1 reported that Optimum Health Trust's income was distributed to Euphoria Equities, and as a result Optimum Health Trust reported zero tax due for 1996 and 1997.

Larson also prepared a Form 1040NR, U.S. Nonresident Alien Income Tax Return, for Euphoria Equities for 1996, and two Forms 1040NR for 1997, one of which was an amendment. Like the returns filed for Optimum Health Trust, Euphoria Equities' returns reported that its income was distributed to its

[*12] beneficiaries, and consequently Euphoria Equities reported zero tax due for 1996 and 1997.[7]

Larson prepared petitioner's tax returns for 1996 and 1997, which were timely filed on April 15, 1997 and 1998, respectively. Petitioner reported gross income of $31,493 and $20,269 on her 1996 and 1997 returns, respectively. As discussed below, during 1996 and 1997 petitioner earned additional gross income from the operation of her chiropractic business of $434,246 and $509,195, respectively, which was omitted from her returns. Larson did not include Optimum Health Trust's business receipts as income on petitioner's returns for 1996 and 1997.

After petitioner started to accumulate what she believed to be tax savings, Palmer convinced her to invest in his company, Wild Fire. Beginning in 1994 and continuing through 1997 petitioner wrote Palmer a series of checks, drawn from her individual and trust bank accounts, for investment. Palmer initially repaid petitioner's investments plus a return of about 15% to 20%, which she would

---

[7]Attached to Euphoria Equities' 1996 Form 1040NR is a Schedule K-1 for its beneficiary, New Covenant Trust, with a reported address in Belize. Attached to Euphoria Equities' first 1997 Form 1040NR is a Schedule K-1 for New Covenant Trust, and attached to its second 1997 Form 1040NR is a Schedule K-1 marked as "amended" for Tri-Global Management, Inc. New Covenant Trust did not file a Federal tax return for 1996 or 1997.

[*13] reinvest with Palmer. Petitioner made her last investment with Palmer in August 1997.

IV. After 1997

After 1997 petitioner made numerous unsuccessful attempts to contact Palmer regarding her investments, not realizing that Palmer had fled the United States for New Zealand. It turned out that petitioner was one of many of Mr. Palmer's investors, and in 2001 he was extradited from New Zealand. In 2001 Palmer and Larson were indicted by a grand jury of the U.S. District Court for the Central District of Illinois for, inter alia, conspiring to defraud the U.S. Department of the Treasury, Internal Revenue Service (IRS), in violation of 18 U.S.C. sec. 371 by promoting, marketing, and selling abusive trusts.

In January 2002 Larson entered into a plea agreement with the United States and pleaded guilty to, inter alia, conspiring to defraud the IRS in violation of 18 U.S.C. sec. 371 and subscribing false and fraudulent income tax returns in violation of section 7206(1). After a jury trial in 2002 Palmer was found guilty of all charges of conspiring to defraud the IRS and aiding and assisting in preparing fraudulent returns and was sentenced to prison.

On December 12, 2002, respondent issued a notice of deficiency to petitioner for tax year 1996. On August 28, 2003, respondent issued two notices

[*14] of deficiency to petitioner, one for tax years 1993 and 1994 and the other for tax years 1995 and 1997.  Petitioner timely filed petitions with the Court seeking redetermination.[8]

OPINION

I.  Statute of Limitations

A.  Tax Years 1993, 1994, and 1995

Section 6501(a) provides that the Commissioner must assess any income tax within the three-year period after a taxpayer files his return, unless certain exceptions apply.  In the case of a substantial omission of income, the period of limitations can be extended to six years.  Sec. 6501(e)(1)(A).  If, however, a taxpayer files a false or fraudulent return with the intent to evade tax, the tax may be assessed at any time.  Sec. 6501(c)(1).  In Allen v. Commissioner, 128 T.C. 37, 42 (2007), the Court held that section 6501(c) indefinitely extends the period of limitations on assessment in the case of a false or fraudulent return, even though it is the preparer and not the taxpayer who intended to evade tax.

---

[8]On May 2, 2012, petitioner filed an amended petition in each case.  In docket No. 4058-03, petitioner expanded her claim for a theft loss deduction and a carryback for tax year 1996.  In docket Nos. 20447-03 and 20448-03, petitioner added a claim for a theft loss deduction and a carryback for tax years 1993, 1994, 1995, and 1997.

**[*15]** The definition of fraud for purposes of the section 6501(c) period of limitations on assessment is the same as the definition of fraud for purposes of the section 6663 fraud penalty. Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner, 114 T.C. 533, 548 (2000). The elements of fraud are: (1) the taxpayer has underpaid his tax for each year and (2) some part of each underpayment is due to fraud. See DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992).

Respondent asserts that the periods to assess petitioner's tax liabilities for 1993, 1994, and 1995 are open under section 6501(c) because petitioner's underpayments of tax are due to her return preparer's fraud. Petitioner has conceded respondent's calculations in the notices of deficiency and, except for her theft loss claim, does not dispute that she underpaid her tax for the years in issue. Thus, in order to prevail under section 6501(c), respondent must prove by clear and convincing evidence that petitioner's return preparer, Larson, filed false or fraudulent returns with the intent to evade tax. See sec. 7454(a); Rule 142(b). To meet this burden, respondent must prove that Larson intended to evade tax known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of tax. See Parks v. Commissioner, 94 T.C. 654, 661 (1990).

**[*16]** Fraud is the intentional commission of an act or acts for the specific purpose of evading tax believed to be due and owing. Petzoldt v. Commissioner, 92 T.C. 661, 698 (1989). Fraud may not be imputed or presumed but must be established by independent evidence. Id. at 699. Fraud is not synonymous with negligence, either general or gross, because fraud requires scienter. Webb v. Commissioner, 394 F.2d 366, 377-378 (5th Cir. 1968), aff'g T.C. Memo. 1966-81. "Fraud implies bad faith, intentional wrong doing and a sinister motive", whereas negligence or gross negligence bespeaks a breach of duty of care. Davis v. Commissioner, 184 F.2d 86, 87 (10th Cir. 1950), remanding a Memorandum Opinion of this Court.

The existence of fraud is a factual determination upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), aff'd without published opinion, 578 F.2d 1383 (8th Cir. 1978). Among the factors to be evaluated in determining whether a return preparer acted with fraudulent intent are: (1) understatements of tax; (2) inadequate books and records; (3) implausible or inconsistent explanations of behavior; (4) failure to cooperate with, or failure to provide access to records to, tax authorities; (5) making false entries or alterations; (6) keeping a double set of records; and (7) any other conduct the likely effect of

**[*17]** which is to mislead or to conceal. See Spies v. United States, 317 U.S. 492, 499 (1943); see also Eriksen v. Commissioner, T.C. Memo. 2012-194.

1. Tax Year 1993

Respondent contends that Larson fraudulently understated petitioner's income tax for 1993 by deducting the $46,000 petitioner paid Palmer in November 1993 for her first abusive trust arrangement. Respondent argues that Larson knew that the $46,000 payment was unrelated to petitioner's chiropractic business and therefore was an impermissible business expense deduction under section 162. Respondent also argues that Larson knew that the purpose of the trust arrangement was to avoid tax, and with this knowledge Larson purposefully mischaracterized petitioner's $46,000 payment as cost of sales and contract services so as not to raise a "red flag" with respondent.

Although respondent correctly points out that petitioner's $46,000 payment for the first trust arrangement was unrelated to her chiropractic business and therefore was improperly deducted as a section 162 business expense, Larson's deduction of the payment does not demonstrate a clear and convincing intent to evade tax or a sinister motive. After reviewing Palmer's books and videos and meeting with him several times to question the trust arrangement, Larson believed, albeit mistakenly, that the trust arrangement was legitimate. At that time, Larson

**[*18]** also incorrectly viewed the trust arrangement as a financial planning arrangement whereby petitioner might reduce her taxable business income. Moreover, in exchange for petitioner's $46,000 payment, she received four trusts and assistance with incorporating her sole proprietorship as Optimum Health, a fiscal year C corporation. Larson therefore reported petitioner's $46,000 payment as a business expense deduction on her Schedule C for 1993 and a net profit of $102,773.

Thus, while Larson's misdirected reliance on Palmer's claims about the legitimacy of his trust arrangement, combined with his misunderstanding of business expense deductions under section 162, connote negligence, his conduct in preparing petitioner's 1993 return was not clearly and convincingly fraudulent. In fact, Larson's lack of fraudulent intent with respect to the $46,000 payment was particularly evident at trial. Larson, almost 18 years after preparing petitioner's 1993 return, testified that his only error with regard to the $46,000 payment was that he should have amortized the payment as a startup business expense rather than deducting the payment in full. Accordingly, the extended limitations period set forth in section 6501(c) is not applicable, and respondent's determination relating to tax year 1993 is time barred.

[*19]      2. <u>Tax Years 1994 and 1995</u>

Larson's conduct in preparing petitioner's returns for tax years 1994 and 1995 was more egregious.  In addition to individual returns, Larson prepared the 1994 and 1995 corporate returns for petitioner's solely owned corporation, Optimum Health.  On each of the corporate returns Larson reported Optimum Health's trust payments and payments to Palmer and his entities as section 162 business expense deductions.  Larson lacked any evidence that the payments were related to petitioner's chiropractic business or, more importantly, that Optimum Health actually received goods, services, or rental equipment in exchange for the payments.  In fact, unlike petitioner's payment for Palmer's trusts in 1993, Optimum Health received nothing in exchange for its trust payments in 1994 and 1995.

Larson characterized the trust payments as "cost of sales", "management fees", and "rent".  Although he claimed to rely on Optimum Health's books and records to characterize the payments, he prepared Optimum Health's books and records using, inter alia, check stub descriptions and Palmer's instructions.  Larson was therefore responsible for any purported mischaracterizations of the trust payments.

[*20] Larson knew that the purpose of the trust arrangement was to reduce Optimum Health's taxable business income. Indeed, Optimum Health's deductions for its trust payments and payments to Palmer and his entities, which totaled $154,000 and $162,000 for 1994 and 1995, respectively, significantly reduced Optimum Health's taxable business income to $16,635 and $27,542, respectively.

Larson also knew that petitioner's trusts, which received $144,000 of Optimum Health's income each year, had not filed returns, thereby avoiding any tax on the trust payments. Petitioner, who had complete control of the trust bank accounts, had access to any business receipts siphoned from Optimum Health and used the trust funds for personal expenses. Nonetheless, in preparing petitioner's 1994 and 1995 returns, Larson omitted Optimum Health's trust payments from petitioner's income. Larson therefore also knew that petitioner's taxable income was reduced and the tax on her trust payments would be avoided entirely.[9]

The Court therefore finds that Larson knew that Optimum Health's trust payment deductions were false, and by falsely characterizing these payments he

---

[9]Petitioner was Optimum Health's sole shareholder. Optimum Health's distribution of property, whether directly or indirectly, to petitioner was taxable dividend income to petitioner. See infra pp. 23-25.

**[\*21]** demonstrated fraudulent intent.[10]  Moreover, by failing to report Optimum

Health's trust payments as income to its sole shareholder, petitioner, and thereby

avoiding tax on these payments, Larson prepared petitioner's 1994 and 1995

returns with the intent to evade tax.  Accordingly, petitioner's 1994 and 1995

returns were false and fraudulent, and section 6501(c) extends the limitations

periods for tax years 1994 and 1995.  Respondent may therefore assess and collect

any deficiencies in petitioner's 1994 and 1995 income tax.

   B.  Tax Years 1996 and 1997

   The general three-year limitations period on assessment of tax is extended to

six years if a taxpayer omits an amount from gross income which exceeds 25% of

the amount of gross income stated on the return.  Sec. 6501(e)(1)(A).  Petitioner

reported gross income of $31,493 and $20,269 on her 1996 and 1997 returns,

respectively.  As discussed below, during 1996 and 1997 petitioner had gross

receipts from the operation of her chiropractic business of $434,246 and $509,195,

respectively, which were omitted from her returns.  The amounts of gross income

omitted from her 1996 and 1997 returns exceeded 25% of the gross income

---

[10]In 2002 Larson entered into a plea agreement with the United States and pleaded guilty to conspiring to defraud the IRS in the preparation of Optimum Health's corporate income tax returns for fiscal years ending November 30, 1994 and 1995.

**[*22]** reported on her returns. Therefore, the limitations periods for assessing petitioner's 1996 and 1997 income tax were extended to six years. See id.

Petitioner filed her 1996 and 1997 returns on April 15, 1997 and 1998, respectively. After applying section 6501(e)(1)(A), the limitations periods for petitioner's 1996 and 1997 income tax were extended to April 15, 2003 and 2004, respectively. Respondent issued petitioner a notice of deficiency for her 1996 income tax and penalties on December 12, 2002. He issued to petitioner a notice of deficiency for her 1997 income tax and penalties on August 28, 2003. Accordingly, the notices of deficiency for petitioner's 1996 and 1997 tax years were timely, and respondent may assess and collect any deficiencies in petitioner's income tax for those years.

## II. Deficiency

Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer bears the burden of proving it incorrect. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

For the tax years in issue respondent determined, and petitioner concedes, that the entities involved in her trust arrangements were shams. Accordingly, the entities may be disregarded for Federal income tax purposes, see, e.g., Markosian v. Commissioner, 73 T.C. 1235, 1245 (1980), and the Court "will look through that

**[*23]** form and apply the tax law according to the substance of the transaction",
Zmuda v. Commissioner, 79 T.C. 714, 719-720 (1982), aff'd, 731 F.2d 1417 (9th
Cir. 1984).

In addition petitioner has conceded the calculations of income, deductions,
and credits for the years in issue as determined in the notices of deficiency but
argues that she is entitled to a theft loss deduction. Before discussing petitioner's
theft loss claim, the Court will address the calculation of petitioner's income tax
deficiencies for the remaining years in issue notwithstanding petitioner's
concession. The factual and legal circumstances of petitioner's understatements of
income tax are significant for purposes of the Court's section 6662 accuracy-
related penalty discussion below.

A. Unreported Income

    1. Tax Years 1994 and 1995

In 1994 and 1995 petitioner, following Palmer's instructions, directed her
solely owned corporation, Optimum Health, to pay a total of $144,000 each year to
three of her trusts, Jupiter, Calypso, and Peaceful Vistas. She then transferred the
$144,000 of trust funds to Euphoria Equities' bank account, which she controlled
and used as her own. In addition, petitioner directed Optimum Health to pay

**[\*24]** $10,000 in 1994 and $18,000 in 1995 to Palmer and his entities for purported financial services.

Section 61(a) provides that gross income includes all income from whatever source derived, including, but not limited to, dividends. Sec. 61(a)(7). A corporation's distribution of property to a shareholder with respect to his stock, whether formally or informally, must be included in the shareholder's gross income as a dividend to the extent of the corporation's earnings and profits. See secs. 301(a), (c)(1), 316; see also United States v. Mews, 923 F.2d 67, 68 (7th Cir. 1991). The shareholder does not need to receive the dividend directly and must include in gross income payments made by the corporation on the shareholder's behalf. See Epstein v. Commissioner, 53 T.C. 459, 474-475 (1969). In determining whether a shareholder received a constructive dividend, the Court considers whether the payment by the corporation benefited the shareholder personally rather than furthering the interest of the corporation. See Hagaman v. Commissioner, 958 F.2d 684, 690-691 (6th Cir. 1992), aff'g in part and remanding on other grounds T.C. Memo. 1987-549.

Optimum Health's payments to petitioner's trusts ended up in a bank account that petitioner controlled and used to pay her personal expenses. Petitioner concedes that the trusts were shams. Thus, Optimum Health indirectly paid

[*25] petitioner through her trust arrangement $144,000 in 1994 and $144,000 in 1995. Petitioner must therefore include these payments in income as constructive dividends to the extent of Optimum Health's earnings and profits. See secs. 61(a)(7), 301(a), (c)(1), 316; see also Epstein v. Commissioner, 53 T.C. at 474-475.

Similarly, Optimum Health paid Palmer and his entities $10,000 in 1994 and $18,000 in 1995 for purported financial services. Palmer's alleged financial advice was unrelated to Optimum Health's chiropractic business but rather was personal to petitioner. Therefore, Optimum Health's payments to Palmer and his entities were made on petitioner's behalf; and provided that Optimum Health had sufficient earnings and profits for 1994 and 1995, petitioner must include these payments in income as constructive dividends. See secs. 61(a)(7), 301(a), (c)(1), 316.

Optimum Health operated for two fiscal years ending November 30, 1994 and 1995.[11] After disallowing its payments to the trusts and to Palmer and his entities, Optimum Health had taxable income of $170,635 and $189,542 for 1994 and 1995, respectively. Accordingly, Optimum Health had earnings and profits for 1994 and 1995 in excess of the amounts it indirectly transferred to petitioner, and as respondent determined and petitioner concedes, petitioner should have reported dividend income of $154,000 and $162,000 for 1994 and 1995, respectively.

---

[11]See supra pp. 7-8 and note 4.

**[*26]** 2. <u>Tax Years 1996 and 1997</u>

During 1996 and 1997 petitioner's business trust, Optimum Health Trust, reported business receipts earned solely from petitioner's chiropractic services. Through a series of transactions, Optimum Health Trust transferred its net business income of $205,173 in 1996 and $214,392 in 1997 to Euphoria Equities' bank account. Petitioner controlled Euphoria Equities' bank account and used the account to pay bills and other personal expenses. On its trust returns for 1996 and 1997 Optimum Health Trust reported that it distributed its net profits to its beneficiary and consequently reported zero tax due.

Section 61 provides that gross income includes all income from whatever source derived and, in section 61(a)(2), specifically lists gross income derived from business. As a general rule, items of gross income must be included in the gross income of a cash method taxpayer for the year in which the taxpayer actually or constructively received the income. <u>See</u> sec. 451(a); sec. 1.451-1(a), Income Tax Regs. Income not actually reduced to a taxpayer's possession is constructively received by a taxpayer in the year during which the income is credited to an account, set apart, or otherwise made available so that the taxpayer may draw upon it at any time. Sec. 1.451-2(a), Income Tax Regs.

[*27] Optimum Health Trust earned its income solely from petitioner's chiropractic business, and through a series of transactions it transferred all of its income to a bank account petitioner controlled. The parties agree that Optimum Health Trust and its related entities were shams. Thus, any transfers of income from Optimum Health Trust to petitioner must be reported as business income to petitioner. Petitioner therefore failed to report business income of $205,173 and $214,392 for tax years 1996 and 1997, respectively.[12]

### B. Theft Loss

Petitioner claims that she is entitled to a theft loss deduction for the money she paid Palmer during the years in issue. Although petitioner did not provide any evidence documenting the amount of the purported theft loss, she testified at trial that Palmer owes her $570,000 plus interest. Petitioner is not sure when she discovered the loss, but she made her last investment with Palmer in August 1997. Around that time she tried to contact Palmer, but he did not respond. Palmer had fled the United States and in 2001 was extradited from New Zealand. In 2002 Palmer was found guilty by a jury of defrauding the IRS and was sentenced to

---

[12]Respondent also determined, and petitioner does not dispute, that petitioner is liable for self-employment tax under sec. 1401 on her unreported business income and is entitled to corresponding self-employment tax deductions.

**[*28]** prison. In 2004 petitioner joined a class action suit against Palmer that is still pending.

Although petitioner did not discover the theft until after 1997, the last tax year in issue, the Court has jurisdiction to consider facts related to tax years not in issue as may be necessary to redetermine the amount of a deficiency for the period before the Court. See sec. 6214(b). In addition, deductions are a matter of legislative grace, and the taxpayer bears the burden of proving that she is entitled to any deductions claimed. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Taxpayers must maintain sufficient records to establish the amounts of allowable deductions and to enable the Commissioner to determine the taxpayers' correct tax liabilities. See sec. 6001; Shea v. Commissioner, 112 T.C. 183, 186 (1999); sec. 1.6001-1(a), Income Tax Regs.

Section 165(a) provides that a taxpayer may deduct any loss sustained during the taxable year and not compensated for by insurance or otherwise. For individuals, a loss is deductible only when: (1) losses are incurred in a trade or business; (2) losses are incurred in a transaction entered into for profit though not connected to a trade or business; or (3) losses arise from fire, storm, shipwreck, or other casualty, or from theft. Sec. 165(c).

**[\*29]** "Theft" for purposes of section 165 is a word of general and broad meaning that includes any criminal appropriation of another's property, including theft by swindling, false pretenses, and other forms of guile. Edwards v. Bromberg, 232 F.2d 107, 110 (5th Cir. 1956); sec. 1.165-8(d), Income Tax Regs. Whether a theft loss occurred depends upon the law of the State where the alleged theft occurred. Luman v. Commissioner, 79 T.C. 846, 860 (1982). A taxpayer must prove by only a preponderance of the evidence a theft occurred under applicable State law. Allen v. Commissioner, 16 T.C. 163, 166 (1951).

Generally, a theft loss is treated as sustained in the taxable year in which the taxpayer discovers it. Sec. 165(a), (e). However, if there is a claim for reimbursement for which there is a reasonable prospect for recovery, then the loss is treated as sustained only when it can be ascertained with reasonable certainty that the reimbursement will not be obtained. Secs. 1.165-1(d)(2)(i), (3), 1.165-8(a)(2), Income Tax Regs.

Although a theft loss may create a net operating loss, the general rule for carrying back a net operating loss is that it may be first deducted from income in the tax year that is two years before the year of the net operating loss. Sec. 172(b)(1)(A)(i). A net operating loss is the excess of deductions over gross income. Sec. 172(c).

**[\*30]** Assuming petitioner can prove that a theft occurred under the law of Illinois, the State in which the alleged theft occurred, she cannot establish the amount of the loss or whether she will receive reimbursement. At the earliest, petitioner's theft loss was sustained in 1998 and may be carried back to 1996. However, petitioner may claim a net operating loss carryback deduction for her 1996 tax year only to the extent that her deductions for 1998, including the theft loss deduction, exceeded her gross income for 1998. Petitioner has not provided any evidence of a net operating loss in 1998. Her testimony that Palmer owes her $570,000 plus interest is self-serving and without more is insufficient to substantiate the amount of her alleged theft loss. Moreover, petitioner joined a class action lawsuit against Palmer seeking reimbursement for her losses, and the lawsuit is still pending. Petitioner may therefore have a reasonable prospect for recovery, and she has not proven otherwise. Accordingly, petitioner is not entitled to a theft loss deduction for any of the years in issue.

III. Accuracy-Related Penalty

Respondent determined that petitioner is liable for accuracy-related penalties under section 6662(a) and (b)(1) and (2) for negligence and for substantial understatements of income tax. Negligence includes any failure to make a reasonable attempt to comply with the law, including any failure to maintain

**[*31]** adequate books and records or to substantiate items properly. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. In the case of an individual, an understatement of income tax is substantial if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). Petitioner's understatements of income tax for tax years 1994 through 1997 are substantial because for each year her understatement exceeds 10% of the tax required to be shown on her income tax return, which is greater than $5,000.

Taxpayers may, however, avoid the accuracy-related penalty under section 6662(a) by establishing that they acted with reasonable cause and in good faith. Sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. 438, 448 (2001). Reasonable cause and good faith include reliance on professional advice if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. Sec. 1.6664-4(b)(1), Income Tax Regs. A taxpayer asserting reliance on professional advice must prove that: (1) the adviser was a competent professional with sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). Good-faith reliance, however, does not include reliance on a "promoter", "'an adviser who participated

**[*32]** in structuring the transaction or is otherwise related to, has an interest in, or profits from the transaction'" when the transaction is a tax shelter offered to numerous parties. 106 Ltd. v. Commissioner, 136 T.C. 67, 79-80 (2011) (quoting Tigers Eye Trading, LLC v. Commissioner, T.C. Memo. 2009-121), aff'd, 684 F.3d 84 (D.C. Cir. 2012).

Petitioner claims that section 6664(c) relieves her of the accuracy-related penalties because she reasonably relied on Larson, her return preparer, to determine the proper treatment of her income and business expenses. Petitioner also claims that she trusted Palmer because he was her minister.

The parties stipulated that Palmer "promoted, marketed and sold" the trust arrangements in issue to petitioner. Palmer was therefore a promoter, and petitioner could not reasonably and in good faith rely on his advice with respect to these trusts. See 106 Ltd. v. Commissioner, 136 T.C. at 79.

In addition, despite petitioner's claim that she relied on Larson to determine the tax consequences of her income and expenses, beginning in 1994 she was fully aware of the tax-avoidance nature of Palmer's trust arrangements. In 1993, which is no longer in issue, petitioner researched Palmer's proposed trust arrangement by studying the books and videos he provided. She also met with Larson, who, despite being introduced to petitioner by Palmer, also sought to ascertain the

[*33] legality of Palmer's trust arrangement and advised petitioner regarding the same. Thus, it is likely that up until 1994 petitioner acted in good faith and reasonably relied on Larson with respect to her underpayments.

However, beginning in 1994 and continuing through 1997, petitioner's participation in Palmer's abusive trust arrangements escalated. Petitioner had practiced as a sole proprietor since 1985 and therefore was at the very least familiar with reporting receipts and expenses from her chiropractic business. Nonetheless in 1994 and again in 1995 petitioner, at Palmer's instructions, moved $144,000 of her business receipts through her trusts to a trust bank account that she controlled and used as her own. Petitioner knew that the $144,000 of trust payments was deducted from her taxable business receipts without being reported on her individual returns and therefore was not taxed. Accordingly, petitioner no longer acted with good faith and any reliance on her tax advisers was unreasonable.

After about two years of purported "tax savings" or, more correctly, tax avoidance, petitioner, at Larson's suggestion, considered a more aggressive tax avoidance scheme offered by Aegis.[13] Although petitioner decided to stay with Palmer, in December 1995 she adopted and implemented a second trust arrangement that Palmer advertised as similar to the Aegis plan but at a fraction of

---

[13]See supra p. 9 and note 5.

**[*34]** the cost. Under this arrangement, petitioner reported zero tax on her business receipts for tax years 1996 and 1997 while continuing to access her business income deposited in a trust bank account. A taxpayer with even less tax experience than petitioner would have been fully aware of the aggressive tax avoidance implications of this arrangement. Petitioner therefore did not act with reasonable cause and in good faith with respect to her underpayments of income tax for tax years 1994 through 1997, and respondent's accuracy-related penalties for those years are sustained.

The Court has considered the parties' arguments and, to the extent not addressed herein, concludes that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.