**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Levi R. MEWS, Defendant–Appellant.**

**No. 90–2578.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 7, 1990.

Decided Jan. 17, 1991.

Mel S. Johnson, Asst. U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Robert E. Meldman, Mulcahy & Wherry, Robert E. Dallman, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, Milwaukee, Wis., William F. Garrow, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, Denver, Colo., for defendant-appellant.

Before POSNER and RIPPLE, Circuit Judges, and GRANT, Senior District Judge.[*]

POSNER, Circuit Judge.

A jury convicted Levi Mews of filing a false income tax return in 1982, in which he reported taxable income of $2,600, and in 1983, in which he reported taxable income of $4,640. 26 U.S.C. § 7206(1). The judge sentenced Mews to thirty months in prison

---

[*] Hon. Robert A. Grant, of the Northern District     of Indiana, sitting by designation.

and fined him $50,000. The principal question is whether certain transfers between corporations wholly owned by Mews were "constructive dividends" to him, in which event he was required to report them as income. Most of the transfers, all of which were made at his direction, took the form of one corporation's paying a debt owed by the other. One, however, took the form of one corporation's giving money to another to buy a Cadillac for Mews's use. The corporation that bought the Cadillac had no business activities at the time it bought it and the time during which Mews used it. Another one of the transfers, in extinguishing a mortgage debt of the transferee, incidentally extinguished a personal debt of Mews, for he had cosigned the mortgage note along with his corporation.

In the two intercorporate transfers just mentioned, the personal benefit to Mews was palpable and direct; in the others less so. The jury was instructed that, before the transfer could be deemed a constructive dividend to Mews, the government had to prove both that Mews had gotten a personal benefit from the transfer and that the conferral of such a benefit was the transfer's primary purpose.

These requirements, though drawn from language in a civil case involving constructive dividends, *Mills v. Internal Revenue Service*, 840 F.2d 229, 235 (4th Cir.1988) (more distant ancestors are *Sammons v. Commissioner*, 472 F.2d 449, 451–52 (5th Cir.1972), and *Stinnett's Pontiac Service, Inc. v. Commissioner*, 730 F.2d 634, 640–41 (11th Cir.1984)), do not exist, unless "personal benefit" is understood to be a fiction.

■ By "constructive dividend" the law means simply a corporate disbursement that is a dividend in the contemplation of law though not called such by the corporation making the disbursement. *Hadley v. Commissioner*, 36 F.2d 543, 544 (D.C.Cir. 1929); *Sachs v. Commissioner*, 277 F.2d 879, 882–83 (8th Cir.1960). Every disbursement that is not an expenditure for the corporation's benefit—that is not a purchase, a loan (as in *Mills* itself, or *Joseph Lupowitz Sons, Inc. v. Commissioner*, 497

F.2d 862, 868 (3d Cir.1974)), the repayment of a debt, an ordinary and necessary business expense, etc.—must be a dividend, for if it does not benefit the corporation it must benefit the shareholders. It need not be paid to the shareholders any more than it need be called a dividend. Just as you cannot escape income tax by assigning the right to receive your income to somebody else, *Lucas v. Earl*, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930); *Hillsboro National Bank v. Commissioner*, 460 U.S. 370, 398–99, 103 S.Ct. 1134, 1151–52, 75 L.Ed.2d 130 (1983), so a shareholder cannot, by directing his corporation to pay to X rather than to himself what corporation law deems a dividend to him, avoid having to report it as income. *Hardin v. United States*, 461 F.2d 865, 872–73 (5th Cir.1972).

■ The intercorporate transfers in this case were not loans, purchases, repayments of corporate debts, charitable expenditures, ordinary and necessary business expenses, or other disbursements made in pursuit of corporate goals or opportunities or pursuant to corporate duties. So they had to be dividends. The fact that Mews, the one and only shareholder, did not put the monies in his pocket but instead had them paid directly to a legal fiction wholly owned by himself did not change their character as dividends. *Id.* The purchase of the Cadillac was unrelated to the corporate objectives of the transferor. It was instead related to the objectives of the owner of the transferor, and hence was a dividend. Where the money composing the dividend ended up was a detail of no legal significance, though the fact that it ended up in the purchase of a car for Mews's personal use—for which neither corporation charged Mews, so that he was receiving income measured by the fair rental value of the car—must have underscored its character as a dividend in the eyes of the jury.

It is true that, had this transfer not been used to finance Mews's personal consumption (just as another transfer was used to extinguish a personal obligation of his), the tax significance of a decision to characterize the transfer as a loan—the only possi-

ble competing characterization—rather than as a dividend would have been subtle rather than blatant. If a dividend were classified as a loan because it was not used to defray a personal expense of Mews's, he would not be beating but only postponing tax liability, to such time as the transferee corporation paid out the money to him or used it to defray his personal expenses, or repaid the money to the transferor corporation which then paid the money to Mews or used it to defray his personal expenses. But postponement is not necessarily an innocent motive in the tax field. The (honest segment of the) tax shelter industry was built on the advantages of postponing tax liability. If you want to postpone tax liability you must follow the forms that the law provides. Mews did not do this. The fact that he used a corporation that he owned to hold a dividend for him that another corporation which he owned had in effect declared did not detract from its character as a dividend to him, any more than would his action in putting a dividend check in his pocket rather than cashing it have done so. The transferee corporations that Mews owned were his pockets.

If this analysis is sound, the jury should not have been instructed that it must find a personal benefit to Mews to convict him, let alone that it must find a personal benefit to him plus a purpose to confer such a benefit, unless the term "personal benefit" was simply and harmlessly defined to mean the opposite of corporate benefit. Which it was not. Given how the jury *was* instructed, the government had to prove more than a constructive dividend—had to prove that the constructive dividend was deliberately and primarily applied to the direct, palpable, demonstrable personal benefit of the shareholder. But the government *did* prove this, not perhaps with respect to every one of the transfers but with respect to enough of them to show that the two income tax returns were indeed false. This was not a suit for a refund, and all the government had to show was that the trivial income reported on the returns was less than the minimum reasonable estimate of Mews's actual taxable income for the years

in question and that he had known this when he signed the returns.

We said that the instruction which required that the government prove a personal benefit to Mews in a direct and tangible sense imposed a heavier burden of proof on the government than was warranted, because a constructive dividend is merely a corporate expenditure that, not being made in pursuit of any corporate objective, must be for the shareholder's benefit even if he doesn't ever have the money jangling in his pockets. But the existence of a personal benefit in this concrete sense is relevant to a vital element of a criminal fraud case, such as this, and that is willfulness. Many a sole shareholder would not understand the scope of the constructive-dividend concept (or, what is the same thing, the limits on the right of a corporation to make transfers to another corporation that are not classifiable as constructive dividends), especially since the courts have been none too clear about the matter; and if he did not he could not be accused of *willfully* filing a false return. There was much evidence of willfulness here, however—not only the deflection of corporate monies to plainly personal ends such as personal transportation and the repayment of a personal debt, but also all the evidence that the defendant's able counsel derided in his brief and argument as "bad acts" evidence that should never have been admitted at trial. The bad acts in question were a variety of conduct—notably including a history of failing to file tax returns—and words all indicating a deliberate attempt by Mews to evade personal income tax through a proliferation of one-man corporations engaged in complex intercorporate transfers. These were not bad acts in the sense in which the law reprobates their use as evidence. They were not acts merely demonstrating that Mr. Mews has a bad character, or a propensity to engage in criminal acts. They were acts that showed that he engaged in transactions for the purpose of evading income tax. Bad acts are admissible to show intent to commit the crime of which the defendant is charged, as distinct from showing a propensity to engage in criminal or immoral behavior. For the principle see

Fed.R.Evid. 404(b), and *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), and for its application to tax cases see *United States v. Birkenstock*, 823 F.2d 1026, 1028 (7th Cir.1987), and *United States v. Jerkins*, 871 F.2d 598, 603–05 (6th Cir.1989).

One disturbing feature of this case, however, is a comment the prosecutor made in his closing argument. The principal evidence that Mews had filed false returns was that the income reported on his returns was much less than the expenditures he had made in those years which the government was able to document. This mode of proof (the "expenditures" method, *United States v. Marrinson*, 832 F.2d 1465, 1469 (7th Cir.1987), a relative of the net worth method of proving income tax evasion) depends of course on the assumption that expenditures in the given year were made out of income earned that year rather than out of capital accumulated from previous earnings or other sources in previous years; or from gifts, or other sources of wealth that are not subject to federal income tax, received during the taxable year. In closing argument the prosecutor noted that the 1982 return for one of Mews's corporations listed a loan from him made that year of $100,000, and the prosecutor asked the jury to infer that this loan had depleted whatever capital Mews might otherwise have used to finance the expenditures that the government proved he had made that year. This was the first mention of the loan at the trial. Mews cries foul. He says the loan listed on the return was a "plug" figure, meant to make assets and liabilities balance; that it was just an accountant's estimate of the value of labor which Mews had contributed to the corporation over the years and for which he had not been reimbursed; and that he could easily have proved this if only he had known the prosecutor was going to bring the loan into the case.

All this seems plausible—though how it would help Mews eludes us. If the corporation gave him a promissory note for $100,000 in lieu of wages, the note would be income to him in the year the note was issued (1982). And if the $100,000 was not a bona fide loan at all, this would suggest tax evasion too because the repayment of the "loan" to Mews would be income to him yet it seems more than unlikely that he intended to treat any such repayment thus.

In any event we have difficulty finding any error by the district court with respect to the prosecutor's comment; and we can reverse only for error. Mews's 1982 return was of course a part of the trial record and had moreover been turned over to the defense well before the trial (anyway it was Mews's own return and presumably he had a copy). It was fair game for comment. The defendant's lawyer did not object when the comment was made or request additional closing argument to enable him to reply to it. We have indicated already our doubt that he could have replied with anything but an admission of an additional $100,000 in income in 1982. And this is not the only reason for thinking that if there was an error here, it was a harmless one. For if one thing is clear it is that Mr. Mews had taxable income in excess of $2,600 in 1982. How much in excess is irrelevant to whether he filed a false return for that year.

AFFIRMED.