# United States Tax Court

T.C. Memo. 2024-109

LEON A. GREENBLATT, III AND LESLIE N. JABINE
GREENBLATT,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

LEON A. GREENBLATT, III AND LESLIE N. JABINE,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 10203-14, 21053-15.          Filed December 16, 2024.

————

Leon A. Greenblatt III and Leslie N. Jabine Greenblatt, pro sese.[1]

*Alexander R. Roche* and *Mayah Solh-Cade*, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

ASHFORD, *Judge*: With respect to petitioners' 2008 and 2009 taxable years, the Internal Revenue Service (IRS or respondent) determined deficiencies in their federal income tax of $93,013 and $24,608, respectively, additions to tax under section 6651(a)(1) of

---

[1] Petitioners were represented by counsel when the Petitions were filed. After trial, the Court granted their counsel's request to withdraw.

**[\*2]** $22,172 and $6,835, respectively, and accuracy-related penalties under section 6662(a) of $18,603 and $4,922, respectively.[2]

After concessions,[3] the following issues remain for decision: (1) whether petitioners are entitled to net operating loss (NOL) carryforward deductions of $18,308,523 and $17,762,211 for 2008 and 2009, respectively; (2) whether petitioners failed to report income for 2008; (3) whether petitioners are entitled to a general business credit for 2008 and 2009; (4) whether petitioners are liable for section 6651 additions to tax for failure to timely file their tax returns for 2008 and 2009; and (5) whether petitioners are liable for section 6662 accuracy-related penalties for 2008 and 2009.

FINDINGS OF FACT

Some of the facts are stipulated and so found. The Stipulation of Facts and the attached Exhibits are incorporated herein by this reference. Petitioners resided in Illinois when the Petitions were timely filed.

Petitioners were married and filed joint federal income tax returns for 2008 and 2009. These cases involve the business activities of petitioner husband, who began working in finance in 1983. His dealings initially included market making on capital markets, and he later branched out to investing in real estate, oil, and gas. Many of petitioner husband's investments were held and managed by various subchapter S corporations that he controlled.

In 1986 petitioner husband and Andrew Jahelka formed Scattered Corp. (Scattered), a subchapter S corporation. Petitioner husband was a 50% shareholder of Scattered throughout its existence.

---

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[3] Respondent concedes that petitioners are entitled to deduct the $66,015 charitable contribution carryover that they claimed for 2008. The parties further agree that various other adjustments reflected in the Notice of Deficiency are computational and must be resolved in the Rule 155 computation. These adjustments include the IRS's disallowance of certain itemized deductions and additional child tax credits petitioners claimed for 2008 and 2009; the IRS's adjustments to deductions for exemptions, self-employment tax, and the recovery rebate credit claimed for 2008; and the IRS's disallowance of the making work pay credit claimed for 2009.

[*3] Scattered became a registered broker/dealer and leased a seat on the Chicago Board of Options Exchange, and later the Midwest Stock Exchange. Mr. Jahelka was the president of Scattered from its inception through 2002 when Scattered wound up its business. Mr. Jahelka was the custodian of Scattered's books and records until 1995 when Scattered hired an in-house accountant.

The Midwest Stock Exchange required Scattered to keep detailed records of its financial information, including records of its compliance with capital requirements, on a daily and intraday basis. As part of complying with its reporting obligations, Scattered filed monthly Financial and Operational Combined Uniform Single (FOCUS) reports and annual audited reports. These reports to market regulators were prepared under Generally Accepted Accounting Principles (GAAP). Pursuant to GAAP, Scattered reported the values of its securities positions on a mark-to-market basis. Scattered reported in its FOCUS report for August 1992 that it received an addition to capital of $756,000 in that month.

Scattered filed timely Forms 1120S, U.S. Income Tax Return for an S Corporation, for 1987–98. Petitioner husband's shares of Scattered's income, gains, and losses, as reported on Schedules K–1, Shareholder's Share of Income, Credits, Deductions, etc., issued to him for 1995–98 are as follows:

| Year | Ordinary Income/(Loss) | Charitable Contributions | Short-term Capital Gain/(Loss) | Long-term Capital Gain/(Loss) |
|------|------------------------|--------------------------|--------------------------------|-------------------------------|
| 1995 | ($1,963,402) | ($6,855) | $35,082 | — |
| 1996 | 1,123,542 | (3,000) | — | — |
| 1997 | 78,098 | — | — | (2,500) |
| 1998 | 1,064,631 | — | — | — |

Scattered did not file federal income tax returns for 1999–2001. Petitioners provided copies of unfiled returns showing petitioner husband's distributive shares of Scattered's tax items for those years. His share of Scattered's 1999 ordinary loss was $3,278, and his shares of Scattered's ordinary income were $271 and $21,219 for 2000 and 2001, respectively.

**[*4]**    Scattered reported that it distributed $1,168,152 and $401,529 to petitioner husband in 1995 and 1996, respectively.  In each year for which it filed Form 1120S, Scattered also reported its balance sheet on Schedule L, Balance Sheets per Books.  Scattered's balance sheets for 1998–2001 show that the shareholder's equity accounts, comprising capital stock, additional paid in capital, and retained earnings, were reduced by amounts not accounted for by current year income or reported distributions.  Scattered reported the following:

| Year | Total Shareholder's Equity at Beginning of Year | Income/(Loss) | Total Shareholder's Equity at End of Year | Implied Distributions |
|---|---|---|---|---|
| 1998 | $1,882,468 | $2,130,262 | $158,984 | $3,853,746 |
| 1999 | 1,123,542 | (3,000) | — | — |
| 2001 | 78,098 | — | — | (2,500) |

Petitioner husband's distributive shares of Scattered's unreported distributions were $1,926,873 for 1998, $110,847 for 1999, and $71,781 for 2001.

Petitioner husband was a 50% shareholder of Rumpelstiltskin (USA) Corp. (Rumpelstiltskin), throughout its existence as both a C corporation and an S corporation.  It was formed as a C corporation on October 21, 1994, and the parties stipulated that it elected to become an S corporation in 1997.  Rumpelstiltskin was funded by a section 351 spinoff transaction with Scattered to separate Scattered's nonbroker/dealer property from its broker/dealer property.  Petitioner husband did not exchange consideration for the Rumpelstiltskin shares he received in the spinoff.

Resource Technology Corp. (RTC) was a wholly owned subsidiary of Rumpelstiltskin from 1997 to 2002.  Neither Rumpelstiltskin nor RTC made an election for RTC to be treated as a qualified subchapter S corporation subsidiary (QSub).  RTC was in the business of extracting landfill gas and converting it into electricity.  This was accomplished by collecting landfill gas and separating out methane gas to burn as fuel to generate electricity.  The methane gas was produced by a process called methanogenesis.  In 1997 petitioner husband executed an installment agreement between himself and RTC wherein he lent RTC $3,600,000.

**[\*5]** The business did not fare as well as hoped, and RTC was placed into involuntary bankruptcy proceedings in 1999.

Rumpelstiltskin filed consolidated returns for itself and its subsidiaries, including RTC, for 1995, 1997–99, and 2002. Rumpelstiltskin reported the following as petitioner husband's shares of Rumpelstiltskin's income, gain, and loss from 1997–99 and 2002:

| Year | Ordinary Income/(Loss) | Interest, Royalties, & Dividends | Capital Gain/(Loss) | Intangible Drilling Cost & Depletion | Rental and Other Expenses |
|---|---|---|---|---|---|
| 1997 | ($6,343,494) | $25,191 | $5,664,520 | ($149,669) | ($51,848) |
| 1998 | (2,453,775) | 2,101 | 62,971 | — | — |
| 1999 | (1,660,569) | 262 | 76,311 | — | — |
| 2002 | (3,693,345) | — | — | — | — |

Rumpelstiltskin did not file returns for 1996, 2000, and 2001. The copies of the unfiled returns that were provided show that Rumpelstiltskin continued consolidating income, gain, and loss with its subsidiaries for those years. The 2000 and 2001 returns include Schedules K–1 on which Rumpelstiltskin reported petitioner husband's shares of income for those years. His shares of Rumpelstiltskin's ordinary losses for 2000 and 2001 were $2,160,896 and $2,720,199, respectively. Rumpelstiltskin also reported $74 of interest and dividend income and $48,950 of long-term capital gain attributable to petitioner husband for 2000. Petitioners report that petitioner husband received $1,228,014 of distributions from Rumpelstiltskin for 1998. Additionally, Rumpelstiltskin's 2001 balance sheet shows that the shareholder's equity accounts were reduced by amounts not accounted for by current year income or reported distributions.

In 1997 Loop Corp. (Loop) was formed in a section 351 transaction with Rumpelstiltskin and elected to be an S corporation on the day of its formation. Pursuant to the section 351 transaction agreement, Rumpelstiltskin contributed all of the assets initially contributed to Loop and received 100% of Loop's outstanding shares. Among other equity interests, the property transferred to Loop included 586,802 shares of VaxGen, Inc., stock and controlling interests in several real estate partnerships. Pursuant to the section 351 transaction

[*6] agreement, Rumpelstiltskin issued 50% of the Loop shares to petitioner husband. Petitioner husband did not provide payment or other consideration to Rumpelstiltskin for the Loop Shares. He remained a 50% shareholder of Loop throughout its existence. Rumpelstiltskin did not report the distribution of Loop shares as a dividend on its 1997 return, nor do petitioner husband's 1997 return or accounting records reflect that he received such a dividend.

Loop reported the following items of income, gain, or loss on Schedules K–1 issued to petitioner husband for 1997–2002:

| Year | Ordinary Income | Interest, Royalties, & Dividends | Section 1231 & Capital Gain/(Loss) | Intangible Drilling Costs & Depletion | Rental and Other Expenses |
|---|---|---|---|---|---|
| 1997 | ($244,669) | $3,172 | — | ($64,563) | ($22,934) |
| 1998 | (1,594,064) | 34,054 | — | (157,973) | (163,289) |
| 1999 | (901,509) | 43,323 | $1,516,518 | — | (392,828) |
| 2000 | 7,626 | 60,495 | 221 | (52,352) | (122,202) |
| 2001 | (1,784,062) | 83,614 | (2,869,384) | (80,023) | (120,960) |
| 2002 | (1,870,150) | 76,285 | (7,667) | — | (292,069) |

Petitioner husband received distributions from Loop totaling $987,478, $289,872, and $125,000 for 1999, 2000, and 2001, respectively.

In addition to the aforementioned corporations, petitioner husband invested in numerous oil and gas well portfolios managed by Everflow Eastern (Everflow) and Tiger Petroleum (Tiger). He also held an interest in a venture under the name Ja-Ro Investments to dig an exploratory well that was discovered to be dry. Each year the well portfolio managers issued annual reports to its investors summarizing their share of gross receipts and expenses. In 2000 a receiver, and subsequently a bankruptcy trustee, were appointed to wind up the affairs of Tiger. As part of the bankruptcy proceedings, the bankruptcy trustee sought in an adversary proceeding to claw back money Tiger had paid as distributions to petitioner husband within the year preceding the bankruptcy.

**[\*7]**   Petitioner husband did not have a personal checking account during 2008 and 2009.  Rather, he used two corporations he controlled, Chiplease, Inc. (Chiplease), and Repurchase, Inc. (Repurchase), to pay his expenses, including petitioners' credit card debts.  As part of this arrangement, Chiplease and Repurchase paid $179,110 of legal fees on behalf of petitioner husband in 2008.[4]   He occasionally deposited personal funds into Chiplease's and Repurchase's checking accounts to reimburse the corporations for the personal expenditures.  For example, petitioner husband received payroll checks totaling $55,271 from various entities in 2008 which he deposited into their accounts.  Deposit slips indicate that totals of $172,728 and $85,000 were deposited into Chiplease's and Repurchase's checking accounts in 2008, respectively.

Michael May began preparing petitioners' returns in 1995.  Mr. May received a bachelor's degree in accounting from the University of Illinois-Chicago in 1985.  He was employed by a certified public accounting firm preparing business and individual returns until 1993 when he opened his own firm doing the same.  Mr. May prepared returns for and furnished tax advice to petitioners personally and to the Greenblatt entities as part of Mr. May's solo practice until 1999 when he was hired by Loop as a full-time employee.  Messrs. Jahelka and May collaborated to prepare and file returns for the S corporations.  Throughout this process petitioners and the S corporations accurately provided all relevant information to prepare the returns, and Mr. May prepared the returns on his understanding of petitioners' business and tax law.

Petitioners did not produce their individual returns for any year before 1995.  On their 1995 return petitioners claimed short-term and long-term capital loss carryover deductions from prior years.  With respect to the NOLs carried forward to 2008 and 2009, petitioners' returns from 1995 to 2006 show an annual increase of losses resulting from losses incurred in petitioner husband's oil and gas investments reported on Schedule C, Profit or Loss From Business, losses from real estate holdings reported on Schedule E, Supplemental Income and Loss,

---

[4] The parties stipulated that personal records petitioners provided indicate Chiplease and Repurchase in fact paid $179,611 in legal fees on petitioner husband's behalf in 2008.  Respondent adjusted petitioner husband's 2008 Schedule C gross receipts by only $179,110 as shown on the 2008 Notice of Deficiency.  On brief both parties indicated that the latter figure is the amount of the IRS's adjustment that is in issue.

[*8] and losses incurred by and passed through the above S corporations, including Scattered, Rumpelstiltskin, and Loop.

On March 13, 2011, and June 22, 2012, petitioners filed their 2008 and 2009 returns, respectively. On those returns petitioners claimed NOL carryforward deductions of $18,308,523 for 2008 and $17,762,211 for 2009. They also claimed a $3,475,204 carryforward of the general business credit on their 2008 return, which went unused and was carried forward to 2009. Petitioners or Rumpelstiltskin claimed general business credits purportedly derived from RTC for each year from 1996 to 2001.

Respondent's Associate Area Counsel Elke Franklin approved the IRS's decision to assert accuracy-related penalties under section 6662 for 2008 when she endorsed an Office of Chief Counsel memorandum seeking approval of the related Notice of Deficiency on January 30, 2014. The 2008 penalty was not approved by a Civil Penalty Approval Form. A Civil Penalty Approval Form authorizing the 2009 penalty was signed by the IRS examining agent's supervisor on May 5, 2015. The 2008 Notice of Deficiency was issued to petitioners on February 7, 2014, and the 2009 Notice of Deficiency was issued to petitioners on May 28, 2015.

## OPINION

Generally, the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and the taxpayer bears the burden of showing the determinations are erroneous. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Petitioners do not allege that the burden of proof should shift to respondent under section 7491(a).

For the presumption of correctness to apply in cases concerning unreported income, the Commissioner must provide some reasonable foundation connecting the taxpayer with the income-producing activity. *Pittman v. Commissioner*, 100 F.3d 1308, 1315–18 (7th Cir. 1996), *aff'g* T.C. Memo. 1995-243, 1995 WL 329854; *Walquist v. Commissioner*, 152 T.C. 61, 67 (2019). Once the Commissioner makes the required threshold showing, the burden shifts to the taxpayer to prove by a preponderance of the evidence that the Commissioner's determinations are arbitrary or erroneous. *Walquist*, 152 T.C. at 67–68 (citing *Helvering v. Taylor*, 293 U.S. 507, 515 (1935)). The IRS's determination set forth in the 2008 Notice of Deficiency with respect to unreported income is supported by the stipulated fact that Chiplease paid $179,110

**[*9]** of legal expenses on behalf of petitioner husband in 2008. Petitioners bear the burden of proof on the unreported income issue.

I. *NOLs*

Tax deductions are a matter of legislative grace, and the taxpayer bears the burden of proving entitlement to any deduction claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). This burden requires the taxpayer to demonstrate that the claimed deduction is allowable pursuant to some statutory provision and to substantiate that the expense to which the deduction relates has been paid or incurred. § 6001; *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976). The taxpayer generally must keep sufficient records to substantiate the amount and business purpose of the expense giving rise to the claimed deduction to enable the IRS to determine the taxpayer's correct tax liability. § 6001.

Section 172 allows an NOL deduction for a taxable year equal to the sum of the NOLs carried forward to that year and the NOLs carried back to that year. § 172(a). In calculating the NOL amount for individual taxpayers, only certain deductions, including passthrough S corporation losses, are considered. *See* § 172(c) and (d); *Barnes v. Commissioner*, T.C. Memo. 2012-80, slip op. at 35, *aff'd*, 712 F.3d 581 (D.C. Cir. 2013). Losses from an S corporation are limited to the shareholder's basis in his or her stock in the corporation and any indebtedness of the S corporation to the shareholder. § 1366(d)(1). To the extent the loss exceeds the shareholder's basis, it may be carried forward indefinitely until the shareholder has an adequate basis in the corporation to absorb the loss. § 1366(d)(2).

A taxpayer who claims an NOL deduction bears the burden of establishing both the existence of the NOL and the amount that may be carried over to the year or years involved. *See* Rule 142(a); *United States v. Olympic Radio & Television, Inc.*, 349 U.S. 232, 235 (1955); *Keith v. Commissioner*, 115 T.C. 605, 621 (2000). The Court has jurisdiction to consider facts related to closed years that are not directly in issue to the extent that those facts may be relevant to our redetermination of tax liabilities for the years that are before the Court. § 6214(b). Petitioners claimed NOL deductions on the basis of losses reported on their individual Schedules C, Schedules D, and Schedules E, Capital Gains and Losses, from 1995 to 2006 and passthrough losses incurred by

[*10] Scattered, Rumpelstiltskin, and Loop—all carried forward to 2008 and 2009.

A.      *Schedule C Deductions*

1.      *Oil and Gas Joint Ventures*

Petitioners claimed deductions attributable to the oil and gas well portfolios managed by Everflow and Tiger from 1995 to 2004. The IRS disallowed all expenses reported on Schedules C for the Everflow and the Tiger investments, and those reported on a Schedule C for Ja-Ro Investments in 1995, for lack of substantiation. The deductions disallowed by the IRS were claimed for depletion, legal and professional services, nonmortgage interest, and other expenses. With respect to the deductions for depletion and intangible drilling costs, petitioners contend that the claimed deductions are correct because they were independently reported to them by the joint ventures. We disagree with petitioners' position.

Petitioners suggest that the depletion deductions were a function of the gross income attributable to petitioner husband from the wells multiplied by a statutorily provided percentage. At trial petitioners claimed that the rate used to calculate the depletion expense was 15%. While that is generally true, petitioners claimed depletion deductions in excess of 15% for most years from 1995 to 2004. Petitioners assert that depletion expenses could be more than 15% of an oil or gas well's gross income depending on the type of well. The spreadsheets prepared by Everflow and Tiger fail to disclose on what basis they calculated the deductions or what types of wells the joint ventures operated. The record is devoid of evidence corroborating their numeric content. Accordingly, petitioners have failed to substantiate their entitlement to depletion deductions exceeding 15% of the gross income from the Everflow and Tiger wells. *See* §§ 611, 613A(c)(1).

Section 263 provides a deduction for intangible drilling costs (IDC). § 263(c). IDC includes costs for labor, fuel, repairs, hauling, and supplies which are used for a variety of purposes including the drilling, shooting, and cleaning of wells, preparation of the drilling of wells, and construction of physical structures necessary for the drilling of wells and the preparation of wells for the production of oil or gas. Treas. Reg. § 1.612-4(a). The election to deduct IDC is made by claiming the costs as a deduction for the first year in which they are paid or incurred. *Id.* para. (d).

[*11] Respondent challenges expenses that petitioners categorized as other expenses on their Schedules C for the oil and gas investments. Statements attached to their returns clarify that the other expenses principally represent IDC. Specifically, respondent claims petitioners have not substantiated the reported $125,000 and $78,760 of expenses incurred by Tiger (through Tiger Petro 95 Joint Venture) and Ja-Ro Investments, respectively, in 1995; $253,762 and $250,261 of expenses incurred by Tiger (through Tiger Petro 96-2 Joint Venture and Tiger Petro 96-4 Joint Venture, respectively) in 1996; or $28,555, $80,452, and $80,452 of expenses incurred by Everflow wells for 2002, 2003, and 2004, respectively. The Everflow wells for which the deductions were claimed began production in 1987, 1988, and 1989.

Petitioners have failed to provide evidence corroborating any of the reported expenses. Yearend reports issued to petitioner husband are similar to Schedules K–1, which we have found to be mere statements of a taxpayer's claim, and insufficient to substantiate it. *See Baker v. Commissioner*, T.C. Memo. 2008-247, slip op. at 9–10 (citing *LeBouef v. Commissioner,* T.C. Memo. 2001-261). For the Everflow expenses incurred from 2002 to 2004, the yearend reports issued to petitioner husband report no IDC, further undermining their claim. Petitioners have failed to substantiate the disputed IDC deductions and may not consider them in the Rule 155 computation.

Petitioners also failed to substantiate their entitlement to the remaining deductions for legal and professional expenses and nonmortgage interest claimed on the oil and gas Schedules C. Petitioner husband testified that he defended a fraudulent conveyance claim arising from Tiger's bankruptcy court proceeding. He provided an invoice from the law firm D'Ancona & Pflaum, LLC, and court dockets and opinions to establish that he incurred such expenses. Attorneys Steven Towbin and Neal Tomlins purportedly represented petitioner husband in that matter.

The bankruptcy court dockets and opinions do not support a deduction because they do not prove an expense and the amount. While the invoice does supply this information, it fails to prove the payor of the expense. The invoice does not establish the expense as one ordinary and necessary to petitioner husband's investment. Especially considering his practice of using corporate funds to pay his individual expenses, we find that petitioners have failed to substantiate their entitlement to any deduction for legal and professional expenses as it relates to his oil and gas investments. Petitioners similarly failed to substantiate the

**[\*12]** nonmortgage interest expenses.  Accordingly, petitioners may not consider either in recomputing their NOL carryforward.

### 2.    *Loan Lease*

For 1999 petitioners reported deductions from income for cost of goods sold of $3,928,396, mortgage interest expenses of $949,645, and legal and professional services expenses of $114,000 on Schedule C for petitioner husband for "Financial-Loan/Lease."  Petitioners contend these items arise from dealings with Old Kent Bank, which sought to repurchase promissory notes it had previously sold to petitioner husband and his partners.  Petitioner husband's testimony was the only evidence provided to substantiate the incurring of the expenses.  Without documentary evidence substantiating these transactions, petitioners have failed to substantiate the deductions claimed with respect to the "Financial-Loan/Lease" Schedule C and may not consider them in recomputing the NOL carryforward.

### 3.    *Investing Activities*

The IRS disallowed certain other deductions petitioners claimed on Schedules C from 2002 to 2007 for legal and professional services and commission expenses.  Specifically, the disputed deductions include a $33,971 legal expense deduction reported on a 2002 Schedule C for "Services" relating to Loop, and legal expenses and commissions totaling $1,094,630 reported on 2004–07 Schedules C for "Investments," "Investment Activitie[s]," or "Investment Activity."  Petitioner husband testified that he could not recall the purpose for the expense on the 2002 Schedule C, and petitioners failed to provide documentation to substantiate it.

Petitioners offered canceled checks written from Chiplease's checking account to various individuals and law firms, as well as invoices from Robinson, Curley, & Clayton, P.C., to substantiate the expenses.  Regardless of the amounts of the checks, the fact that they were drawn from a Chiplease checking account indicates that petitioner husband did not personally incur the expenses.  Petitioners provided no evidence showing how Chiplease accounted for these expenses, or that they reimbursed Chiplease.  Petitioners have failed to establish their entitlement to deduct the disputed legal and professional services and commission expenses reported from 2002 to 2007 and may not recognize such expenses when recomputing their NOL carryforward.

**[*13]** B.    *Schedule E Deductions*

Section 212 provides a deduction for the ordinary and necessary expenses paid or incurred for the management of property held for the production of income.  § 212(2).  The IRS disallowed all Schedule E deductions that petitioners claimed for 1995–2001 attributable to several rental properties.  Petitioners provided depreciation schedules, accounting worksheets, and Form 1098–INT, Mortgage Interest Statement, to substantiate the disallowed expenses, which include rental expenses, operating expenses, condominium fees, management fees, insurance, interest, depreciation, and taxes for several properties.

Petitioners failed to adequately substantiate any such expenses with documentary evidence.  Depreciation schedules and accounting worksheets are insufficient to substantiate the incurring of an expense. *Holden v. Commissioner*, T.C. Memo. 2015-131, at *65–66.  The Forms 1098–INT fail to indicate to which property they relate, other than by handwritten notes in the space below the form.  Moreover, one of the Forms 1098–INT was issued to a Bruce Gregory Greenblatt—not petitioner husband.  Petitioners have failed to substantiate the real estate expenses reported on Schedules E from 1995 to 2001 and may not consider them when computing their NOL carryforward.

C.    *Schedule D Carryover from 1994*

A taxpayer must substantiate his or her right to a capital loss carryover, including verification that the losses were incurred in the prior year.  *Naylor v. Commissioner*, T.C. Memo. 2013-19, at *9–10. Petitioners contend that they are not required to substantiate the loss carryovers because the losses do not affect their NOL deductions for 2008 and 2009.  Petitioners are incorrect.  The capital loss carryovers affect the computation of the NOL carryforward because the capital losses were purportedly exhausted in 1997.  If petitioners fail to substantiate entitlement to the capital loss carryover for 1995, the recalculation of the NOL carryforward must consider capital gains for 1995–97 that were otherwise offset by the carryover.

Petitioners reported a $470,311 short-term capital loss carryover and a $1,867,165 long-term capital loss carryover on their 1995 Schedule D.  Petitioners' returns before 1995 are not part of the record, and petitioners failed to provide documentary evidence in support of the incurring of amounts of the losses.  Accordingly, we find that petitioners failed to substantiate the year in which it originated, the circumstances

**[\*14]** that generated it, or the amount of any capital loss. The Rule 155 computation shall take into account petitioner husband's capital gains from 1995 to 1997.

### D. *Scattered, Rumpelstiltskin, and Loop*

Pursuant to section 172, petitioners must show that (1) the S corporations incurred NOLs in prior years, (2) they had sufficient bases in S corporation shares in those years, (3) no other limitations applied to their realization of the losses, and (4) the losses were properly carried forward to 2008 and 2009. *Jasperson v. Commissioner*, T.C. Memo. 2015-186, at \*8, *aff'd*, 658 F. App'x 962 (11th Cir. 2016).

A shareholder's basis in S corporation stock is equal to the amount he or she contributed to the capital of the S corporation, adjusted by, among other things, the shareholder's distributive share of income, gain, and loss. *See Nathel v. Commissioner*, 131 T.C. 262, 267 (2008), *aff'd*, 615 F.3d 83 (2d Cir. 2010). The taxpayer's basis can also be established by proving the cost to the taxpayer to acquire an asset. § 1012; *Estate of Leavitt v. Commissioner*, 90 T.C. 206, 212 (1988), *aff'd*, 875 F.2d 420 (4th Cir. 1989).

A taxpayer must increase his or her basis in S corporation stock by, among other things, the amount of his or her distributive share of corporate income. § 1367(a)(1). A taxpayer also increases basis by the excess of the deductions for depletion over the basis of the property subject to depletion. § 1367(a)(1)(C). On the other hand, a taxpayer must decrease his or her basis (but not below zero) in S corporation stock by the sum of distributions received and corporate losses. § 1367(a)(2). The amount of loss and deductions realized in any taxable year cannot exceed the sum of the taxpayer's basis in his or her stock or debt of the corporation. § 1366(d)(1). Any loss or deduction that cannot be accounted for because of section 1366(d)(1) is suspended and deemed incurred the succeeding taxable year. § 1366(d)(2)(A).

A taxpayer is required to accurately account for his or her basis in an S corporation. *Jasperson*, T.C. Memo. 2015-168, at \*8–9. He or she substantiates basis by producing source documents verifying the fact and amounts of underlying transactions that result in adjustments to his or her basis, and a basis schedule is not sufficient. *Id*. Forms 1120S generally do not include sufficient information to establish a taxpayer's basis in the reporting corporation. *See Fehlhaber v. Commissioner*, 94 T.C. 863, 869 (1990), *aff'd*, 954 F.2d 653 (11th Cir.

[*15] 1992). Respondent conceded that the Schedules K–1 attached to petitioners' returns for 1995 to 2007 contain accurate income and loss items. Thus, petitioners have substantiated such income and loss items to the extent that they can show that they included their distributive shares of them on their returns.

### 1. *Scattered*

Petitioners did not provide returns for years before 1995, and thus attempt to establish their basis as of the beginning of that year. They have provided insufficient evidence to do so. Mr. Jahelka's testimony that Scattered was formed with a $30,000 initial capital contribution does not establish petitioner husband's initial basis in Scattered. The audited annual reports petitioners provided purport to show Scattered's equity accounts for 1992–96. They are unhelpful to establish petitioners' tax basis, however, because they were prepared under GAAP. Pursuant to GAAP, Scattered reported the value of its securities positions on a mark-to-market basis rather than its tax-relevant cost basis. Petitioners are unable to show the amount of Scattered's income, gain, or loss that they reported on their individual returns before 1995.

Petitioners contend that in 1992 petitioner husband made a capital contribution of $745,925, half of the $1,491,850 increase to additional paid-in capital Scattered reported for that year. Petitioners claim that Scattered's trading records, FOCUS reports, and audited annual reports substantiate the claimed contribution. These documents reflect a capital contribution of $755,706, comprised primarily of securities, in August 1992. These documents fail to establish petitioner husband's basis in Scattered because they do not indicate that he was the source of the property contributed. Further, the information in the documents is generated using GAAP. We are unable to determine the contributor's adjusted basis in the securities at the time of the contribution, and thus, the amount of any basis adjustment. § 1016(a)(1); *Commissioner v. Fink*, 483 U.S. 89, 94 (1987) ("[T]he shareholder is entitled to increase the basis of his shares *by the amount of his basis in the property transferred to the corporation*." (Emphasis added.)).

Even if we were to find that petitioners made a capital contribution in 1992, we are unable to determine its effect on petitioner husband's basis as it existed at the beginning of 1995 because of the lack of evidence showing other required basis adjustments that occurred from 1987 to 1994. Petitioners' individual returns before 1995, which

**[*16]** are not in the record, would indicate the amount petitioners reported as their distributive shares of income, gain, or loss from Scattered from 1992 to 1995. *See* § 1367(b)(1). Because of a lack of substantiation, petitioners' basis in Scattered on January 1, 1995, was zero. *See Welch v. Commissioner*, T.C. Memo. 2012-179, slip op. at 13.

On the basis of respondent's concession regarding the accuracy of Schedules K–1 issued to petitioner husband and petitioners' individual returns for 1995–2001, we find that petitioners have substantiated basis adjustments on account of items of income, gain, and loss as shown on the Schedules K–1 Scattered issued to him for those years. To determine the deductibility of losses, petitioners' basis must be recomputed beginning with zero as of the beginning of 1995, and adjusted for items of income, gain, or loss in the year in which they were incurred by the corporation. *See* § 1367(a). Petitioner husband's basis calculation must consider the distributions made to petitioner husband in 1995, 1996, 1998, 1999, and 2001. The recalculation must account for any current year income, including capital gain, and distributions before loss items which may include NOL deductions from prior years. *See* Treas. Reg. § 1.1367-1(f).

### 2. *Rumpelstiltskin*

Petitioners make various unsupported claims regarding petitioner husband's initial basis in Rumpelstiltskin. They state the entity was formed in 1995 with approximately $11.8 million in assets. In fact Rumpelstiltskin was formed in 1994 and funded by a section 351 transaction with Scattered, which then distributed Rumpelstiltskin stock to its shareholders pro rata. The record contains no evidence that petitioner husband transferred property in exchange for the Rumpelstiltskin shares or that he correspondingly reduced his basis in Scattered. Petitioner husband's beginning basis in Rumpelstiltskin was zero. *See Thomson v. Commissioner*, T.C. Memo. 1983-279, *aff'd without published opinion*, 731 F.2d 889 (11th Cir. 1984).

Petitioner husband contends that Rumpelstiltskin converted to an S corporation in 1997 and his basis in Rumpelstiltskin at the time of conversion was $2,181,881. This number was calculated on the basis of the ending capital stock plus additional paid in capital on Rumpelstiltskin's 1997 return. We disagree with petitioner husband's beginning basis, which used the balance sheet as it existed at the end of the year. An S corporation election is deemed effective on January 1 of the year in which it is made. *See* Treas. Reg. § 1.1362-1(b) ("An

**[\*17]** [S corporation election] is effective for the entire taxable year of the corporation for which it is made . . . ."). The Rule 155 computation shall determine petitioner husband's basis in Rumpelstiltskin, starting with zero at the beginning of 1997.

To establish the NOL carryforwards derived from Rumpelstiltskin, petitioners rely on (1) incomes, gains, and losses passed through to Rumpelstiltskin from RTC and other subsidiaries, (2) the $3,600,000 loan petitioner husband made to RTC, and (3) certain other transactions that they assert generate basis. Respondent contends that Rumpelstiltskin's failure to make a QSub election is detrimental to petitioners' position and that the basis-creating transactions lack documentary support. We agree with respondent.

A QSub is a domestic corporation which (1) is not an ineligible corporation under section 1361(b)(2), (2) is owned 100% by an S corporation, and (3) the S corporation elects to have treated as a QSub. § 1361(b)(3)(B). Generally, a QSub is not treated as a separate corporation, and its assets, liabilities, and items of income, deduction, and credit are treated as consolidated with those of the parent S corporation. § 1361(b)(3)(A). For a corporation to be considered a QSub, the parent corporation must, among other things, file Form 966, Corporate Dissolution or Liquidation. *See* I.R.S. Notice 97-4, 1997-1 C.B. 351. Failure to make a QSub election results in the two corporations' being treated as separate entities. *See* Treas. Reg. § 1.1361-4.

Petitioners failed to provide evidence that a QSub election was made. The election is not reflected on Rumpelstiltskin's or RTC's account transcripts that respondent provided. Nor did petitioners provide a Form 966 or like document that would establish that the election was made. In fact, Mr. Jahelka testified that he had only recently become aware of QSub elections because of this litigation. As a result, RTC's items of income, gain, or loss cannot be consolidated with Rumpelstiltskin's, and petitioner husband is not entitled to adjust his basis in Rumpelstiltskin on account of items of income, gain, or loss originating with RTC.

The exclusion of RTC items also extends to the debt basis that petitioners claim. A shareholder's basis in the corporation's indebtedness to the shareholder is generally the amount lent to the S corporation, adjusted as required by section 1367(b)(2). *See* § 1366(d)(1)(B). Petitioner husband lent $3,600,000 to RTC on

[*18] October 1, 1997. Loans made to RTC cannot increase petitioner husband's debt basis in Rumpelstiltskin because they are separate corporations for tax purposes.

Petitioners produced a basis schedule purporting to show other transactions that affect petitioner husband's basis in Rumpelstiltskin from 1997 to 2002. The schedule lists multiple transactions that petitioners contend should be considered in recomputing petitioner husband's basis. First, it reports that he received a $1,228,014 distribution in 1998. This distribution is corroborated by the equity accounts on Rumpelstiltskin's 1998 balance sheets, which indicate a reduction of equity across that year of $2,325,887. The recalculation of petitioner husband's basis must include the 1998 distribution. Second, the basis schedule indicates that petitioner husband's stock basis increased by $2,726,580 and $605,759 for 1999 and 2000, respectively, for increases to Rumpelstiltskin's paid-in capital. Third, the schedule reflects increases to his debt basis of $1,018,668 for 2000, $662,064 for 2001, and $1,450,817 for 2001. Petitioners make bare assertions that these basis increases reflect loans petitioner husband made to RTC before and during its bankruptcy court proceedings. Again, petitioner husband cannot increase his basis in Rumpelstiltskin on account of loans made to RTC. Regardless, petitioners failed to substantiate the underlying transactions with documentary evidence. Accordingly, they are not entitled to include the asserted basis increases in recalculating petitioner husband's basis in Rumpelstiltskin stock.

Respondent further asserts that petitioners are not entitled to consider losses derived from Rumpelstiltskin in 2000 and 2001 because the returns were not filed. Petitioners' individual returns for these years include Schedules K–1 that reflect petitioners' distributive shares of ordinary losses of $2,160,896 and $2,720,199, respectively. Respondent conceded the accuracy of these amounts, and petitioners' returns show that they included the amounts in their taxable income for each year. Petitioners may include the 2000 and 2001 losses to the extent that they originate with Rumpelstiltskin and that petitioners have bases in their Rumpelstiltskin stock.

Rumpelstiltskin's unfiled 2001 return implies that an unreported distribution was made in that year. On its 2001 balance sheet Rumpelstiltskin reported equity at the beginning of the year of −$23,824,211, income in that year of −$5,440,398, and ending equity of −$33,090,191. These figures reflect an implied reduction of equity of $3,825,582 for the year. Petitioners argue this difference results from

**[\*19]** mark-to-market accounting with respect to LTV Corp., securities that Scattered transferred to Rumpelstiltskin in its formation. They suggest that the fact that Rumpelstiltskin realized a capital gain exceeding the reduction of equity in later years supports this contention. Such a conclusion requires a leap that the record does not support. Petitioners failed to show that the reduction in equity was not the result of a shareholder distribution. Half of the reduction in equity, or $1,912,791, is attributable to petitioner husband. We find that petitioner husband received an unreported distribution and must decrease his basis by an equal amount in 2001 when recalculating his basis in Rumpelstiltskin. *See* § 1368.

The Rule 155 computation of petitioner husband's basis in Rumpelstiltskin must start with zero at the beginning of 1997, and may consider items of income, gain, and loss generated each year, *see* § 1367(a), calculated without inclusion of any item originating with RTC. It must also account for the aforementioned distributions made to petitioner husband in 1998 and 2001.

### 3.  *Loop*

Petitioners contend that petitioner husband's beginning basis in his Loop shares is equal to half of Rumpelstiltskin's adjusted basis in the assets it transferred to Loop in the section 351 transaction. *See* § 301(d) (providing that a taxpayer's basis in property distributed to him or her as a dividend is equal to its fair market value). In fact, much of the evidence in the record relating to Loop seeks to establish Rumpelstiltskin's adjusted basis in such assets at the time they were contributed. We do not agree with petitioners' position.

After receiving the Loop shares in the section 351 transaction, Rumpelstiltskin transferred the Loop stock to its shareholders pro rata, resulting in petitioner husband's owning 50% of Loop. Petitioner husband cannot claim a fair market value basis in the Loop shares under section 301 without establishing that Rumpelstiltskin treated its distribution of the Loop shares as a dividend, which is not supported by the record. Otherwise, petitioners must establish that petitioner husband exchanged consideration for the shares, which the record also does not support. Petitioners' beginning basis in Loop is zero. *See Thomson*, T.C. Memo. 1983-279.

Petitioners also provided a shareholder basis schedule covering 1997–2003. That schedule, prepared by petitioners' accountant, asserts

**[\*20]** that there were several basis-creating events, other than current year income, during those years. Specifically, the schedule reflects that petitioner husband made a capital contribution of $1,521,488 to Loop in 1998 and increases to his debt bases in Loop of $2,490,003 and $1,613,540 in 2000 and 2001, respectively. Petitioners failed to substantiate these transactions.

The basis schedules disclose that petitioner husband received unreported distributions of $987,478, $289,872, and $125,000 for 1999, 2000, and 2001, respectively. Petitioners' accountant testified that the distributions were calculated retroactively by determining the difference in Loop's equity accounts at the beginning and end of the respective year and assigning 50% of any reduction to petitioner husband.

On the basis of respondent's concession and petitioners' inclusion in their taxable income, petitioners are entitled to adjust their basis in Loop for items of income, gain, and loss incurred by the corporation in 1997–2005. *See* § 1367(a). Accordingly, petitioner husband's basis in Loop shall be recomputed with a beginning basis of zero upon receipt of the shares, adjusted for the 1999–2001 distributions and yearly items of income and loss to the extent they were included in petitioners' taxable income for the respective year.

E. *NOL Carryback Election*

A taxpayer may elect to waive the carryback period of an NOL. § 172(b)(3). The election must be made on timely filed tax returns for the years the NOLs are incurred and for which the election is to be in effect. The election is made by attaching a statement to a return that "shall indicate the section under which the election is being made and shall set forth information to identify the election, the period for which it applies, and the taxpayer's basis or entitlement for making the election." Treas. Reg. § 301.9100-12T(d). The election must be unequivocal and unambiguous. *Powers v. Commissioner*, 43 F.3d 172, 176 (5th Cir. 1995), *aff'g in part, rev'g in part and remanding* T.C. Memo. 1993-125 *and* 100 T.C. 457 (1993).

The NOL is carried forward to the extent that it is not absorbed by the taxable income, with adjustments, for each of the preceding taxable years to which it is carried. § 172(b)(2). If the election is not made on a timely filed return, the taxpayer is required to show that the NOL would not have been absorbed in the carryback years before being

**[\*21]** carried forward to the years at issue. *Green v. Commissioner*, T.C. Memo. 2003-244, slip op. at 10. For tax years beginning before August 5, 1997, a taxpayer is required to carry an NOL back 3 years and is permitted to carry it forward for 15 years. § 172(b)(1)(A) (1994). For all years relevant to these cases beginning after August 5, 1997, a taxpayer is required to carry back an NOL 2 years and is permitted to carry it forward 20 years. *See* Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 1082, 111 Stat. 788, 950.

On the basis of our review of the returns in the record, we find that petitioners did not elect to waive the NOL carryback period with respect to any of the NOL carryforwards claimed for 2008 and 2009. Petitioners argue that respondent's failure to produce a more enlightening transcript or pre-1995 tax returns should result in an inference that they would be harmful to respondent. We disagree. Petitioners' argument is an attempt to shift the burden of proof to respondent on this issue. The burden is on petitioners to produce evidence that shows the losses were properly carried forward to the years at issue. *See Jasperson*, T.C. Memo. 2015-186, at \*8.

As a result, petitioners must establish that any NOL otherwise substantiated would not be absorbed in the carryback period. To do so petitioners suggest we make inferential leaps and reverse engineer their income and loss items from the prior years on the basis of the tax liability assessment amounts shown on their account transcripts for those years. Petitioners' argument, without also providing their returns for the carryback period years, fails to prove by a preponderance of the evidence that the NOLs carried forward would not have been absorbed in the carryback period. Petitioners have failed to establish that they properly carried back the NOLs in issue before carrying them forward. Accordingly, the Rule 155 computation must carry back any allowed NOLs to the extent allowable before carrying them forward.

II. *Unreported Constructive Dividends*

A taxpayer's gross income includes amounts received as dividends. § 301(a), (c)(1). A dividend is "any distribution of property made by a corporation to its shareholders—(1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year." § 316(a). Dividends may be formally declared or constructive. A constructive dividend exists where a corporation confers an economic benefit upon a shareholder without expectation of repayment and the corporation, on the date of the deemed

**[\*22]** distribution, had current or accumulated earnings and profits. *Truesdell v. Commissioner*, 89 T.C. 1280, 1295 (1987). "A greater potential for constructive dividends . . . exists in closely held corporations where dealings between stockholders and the corporation are commonly characterized by informality." *Zhadanov v. Commissioner*, T.C. Memo. 2002-104, slip op. at 30.

Disbursements that are not expenditures for the corporation's benefit—such as purchases, loans, repayments of debt, or business expenses—are constructive dividends, for such disbursements, having not benefited the corporation, must benefit the shareholders. *United States v. Mews*, 923 F.2d 67, 68 (7th Cir. 1991). In *Mews* the U.S. Court of Appeals for the Seventh Circuit reiterated the longstanding principle that "a shareholder cannot, by directing his corporation to pay to X rather than to himself what corporation law deems dividend to him, avoid having to report it as income." *Id.* (citing *Hardin v. United States*, 461 F.2d 865, 872–73 (5th Cir. 1972)). Further, petitioners bear the burden of proving that the dividend-paying corporation had insufficient earnings and profits to support the distribution of dividends. *See Pittman v. Commissioner*, 1995 WL 329854, at \*12 (citing *Hagaman v. Commissioner*, T.C. Memo. 1987-549, *aff'd and remanded*, 958 F.2d 684 (6th Cir. 1992)).

Respondent asserts that petitioner husband received constructive dividends in 2008 when Chiplease and Repurchase paid $179,110 for legal services on his behalf. The parties agree that petitioners incurred the legal expenses in 2008 and that they are entitled to a corresponding Schedule C deduction. Petitioners claim that the payments should not be income to them because they reimbursed the corporations. They contend that they deposited $298,392 of personal funds into Chiplease's and Repurchase's checking accounts. Alternatively, petitioners suggest that respondent's failure to show the corporations had sufficient earnings and profits to support a dividend precludes characterizing the payments as such.

Respondent concedes that petitioners made deposits totaling $173,392 into Chiplease's and Repurchase's checking accounts, including the $55,271 of petitioner husband's payroll checks. Petitioners contend that they contributed a total of $298,392 and submitted deposit slips reflecting various deposits into Chiplease's and Repurchase's checking accounts to substantiate the difference. When taken collectively, the deposit slips show $172,728 was deposited to Chiplease's checking account and $85,000 was deposited into

[*23] Repurchase's checking account. Regardless of the amount of funds we find were deposited, petitioners' argument misses a crucial element.

The deposit slips do not validate petitioners' contentions for two reasons. First, the deposit slips and accompanying submissions, with limited exception for the payroll checks, do not identify petitioner husband as the source of the funds deposited. Second, they fail to show the link between the deposits and the payment of petitioner husband's expenses or how Chiplease or Repurchase accounted for petitioners' deposits. Petitioners are unable to show that the deposits were not treated as loans to the corporations, or that the payments for legal services were not made primarily for the benefit of petitioner husband and without expectation of repayment. They provided no evidence showing that the corporations had insufficient earnings and profits to support a dividend. *See Pittman v. Commissioner*, 1995 WL 329854, at *12. Petitioners failed to report $179,110 of constructive dividends for 2008.

III.   *General Business Credit*

As with deductions, credits are a matter of legislative grace, and the burden of showing entitlement to them is on the taxpayer. *Segel v. Commissioner*, 89 T.C. 816, 842 (1987). A taxpayer's prior year returns are statements of his position, and he may not rely solely on them to prove that he is entitled to a general business credit. *McDonald v. Commissioner*, T.C. Memo. 1995-359, 1995 WL 454149, at *4 (citing *Roberts v. Commissioner*, 62 T.C. 834, 839 (1974)), *aff'd without published opinion*, 114 F.3d 1194 (9th Cir. 1997).

Section 38 permits a general business credit against tax equal to the sum of various enumerated credits, including the investment tax credit under section 46. For all years relevant to these cases, the investment tax credit included the energy credit under section 48. *See* § 46(2). Relevantly, section 48 provided that the "energy credit for any taxable year is the energy percentage of the basis of each energy property placed in service during such taxable year." § 48(a)(1). Petitioners purport that RTC generated energy credits under section 48 in its business of converting landfill gas to electricity. Petitioners claimed the credits on their individual returns on the premise that RTC was a QSub and its tax items were consolidated with Rumpelstiltskin's, which passed through to them. Because we have found that RTC is a separate corporation on account of the lack of a QSub election, energy credits may not be passed through to Rumpelstiltskin and/or petitioners.

[*24] The credits, if they are entitled, may affect RTC's income, gain, and loss, and consequently Rumpelstiltskin's distributive share of the same for certain years.

Among other requirements, energy property must either produce, use, or distribute solar energy or energy derived from a geothermal deposit. § 48(a)(3). A geothermal deposit is a "geothermal reservoir consisting of natural heat which is stored in rocks or in an aqueous liquid or vapor." § 613(e)(2). "Geothermal" is defined as "of, relating to, or utilizing the heat of the earth's interior." *Geothermal, Merriam-Webster*, https://www.merriam-webster.com/dictionary/geothermal (last updated Dec. 5, 2024).

Petitioners contend that property RTC placed in service in its business of converting landfill gas into electricity qualifies as energy property. John Connolly, who became RTC's president in 2001, testified that RTC operated plants built on landfills to capture methane gas generated by methanogenesis. Petitioners did not provide expert testimony regarding the process of methanogenesis, but according to Mr. Connolly, it involves the naturally anaerobic decomposition process of landfill waste. The captured gas was then burned as fuel to generate electricity.

Mr. Connolly testified that the landfill gas captured by RTC was not derived from a geothermal deposit and thus fails to qualify the property as energy property. Section 613(e)(2) defines a geothermal deposit as consisting of "natural heat." RTC did not capture natural heat but produced heat through the combustion of methane gas. Generating thermal heat via combustion of a gas, whether collected above or below ground, is fundamentally distinguishable from capturing thermal energy that exists naturally in the earth's interior. RTC burned the diverted gas to power an engine that propelled an electricity generator. Natural heat had no role in the process. Property placed into service by RTC for the purpose of capturing and converting landfill gas cannot qualify as energy property. We sustain the IRS's determinations with respect to the general business credit carryforwards, and they may not be considered when determining Rumpelstiltskin's distributive shares of RTC income, gain, or loss.

IV. *Additions to Tax*

Section 6651(a)(1) imposes an addition to tax for a taxpayer's failure to file a required return on or before the specified filing date,

**[\*25]** including extensions. The Commissioner bears the burden of production with respect to the section 6651(a)(1) addition to tax, *see* § 7491(c), but the taxpayer bears the burden of proving that the Commissioner's determination with respect to the section 6651(a)(1) addition to tax is incorrect, *Wheeler v. Commissioner*, 127 T.C. 200, 207–08 (2006), *aff'd*, 521 F.3d 1289 (10th Cir. 2008). The Commissioner satisfies his burden of production by providing sufficient evidence to show that the taxpayer filed his federal income tax return late. *Id.*; *Higbee v. Commissioner*, 116 T.C. 438, 447 (2001).

Petitioners' returns for 2008 and 2009 were due by October 15, 2009, and October 15, 2010, respectively. Petitioners untimely filed their 2008 return on March 13, 2011, and their 2009 return on June 22, 2011, as indicated by the stamps showing when the IRS received the returns. Respondent has met his burden of production with respect to the additions to tax under section 6651(a)(1) for 2008 and 2009.

Application of the section 6651(a)(1) addition to tax may be avoided if the taxpayer shows that the failure to timely file was due to reasonable cause and not due to willful neglect. An untimely filing is due to reasonable cause "[i]f the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time." Treas. Reg. § 301.6651-1(c)(1). Petitioners only argue that no addition to tax could apply because there were no deficiencies. Petitioners do not claim nor does the record support a finding that petitioners' failure to timely file was due to reasonable cause. Accordingly, we sustain the additions to tax under section 6651(a)(1) against petitioners for 2008 and 2009.

V.    *Accuracy-Related Penalties*

Section 6662(a) imposes a 20% accuracy-related penalty on any portion of an underpayment of tax required to be shown on a return if, as provided by section 6662(b)(1) and (2), the underpayment is attributable to "[n]egligence or disregard of rules or regulations" and/or a "substantial understatement of income tax." Negligence includes "any failure to make a reasonable attempt to comply" with the internal revenue laws, and "disregard" includes "any careless, reckless, or intentional disregard." § 6662(c). An understatement of income tax is substantial if it exceeds the greater of 10% of the tax required to be shown on the return for that taxable year or $5,000. § 6662(d)(1)(A).

**[*26]**  Respondent bears the burden of production with respect to section 6662(a) penalties and is required to present sufficient evidence showing that any penalty is appropriate.  *See* § 7491(c); *Higbee*, 116 T.C. at 446–47.  This includes showing compliance with the procedural requirements of section 6751(b)(1).  *See Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016).  Respondent can meet his burden by presenting sufficient evidence to show that it is appropriate to impose a penalty in the absence of available defenses.  *See id.* (citing *Higbee*, 116 T.C. at 446).  We do not need to determine whether respondent's burden was met since we conclude that petitioners had reasonable cause for the underpayments.

The accuracy-related penalty does not apply with respect to any portion of the underpayment for which the taxpayer shows reasonable cause and good faith.  § 6664(c)(1); *see Higbee*, 116 T.C. at 448–49.  Whether a taxpayer acted with reasonable cause and good faith depends upon all pertinent facts and circumstances.  Treas. Reg. § 1.6664-4(b)(1).  Relevant factors include the taxpayer's efforts to assess his or her proper tax liability, including the taxpayer's good faith reliance on the advice of a professional.  A misunderstanding of fact or law that is reasonable in the light of the experience, knowledge, and education of the taxpayer may indicate reasonable cause and good faith.  Petitioners bear the burden of showing that there was reasonable cause for, and that they acted in good faith with respect to, any portion of the underpayments.  *See* § 6664(c)(1); *Higbee*, 438 T.C. at 446–47.

Reasonable reliance on informed, competent professionals may establish reasonable cause.  *United States v. Boyle*, 469 U.S. 241, 250–51 (1985).  A taxpayer claiming reliance on his or her advisers must establish by a preponderance of the evidence that (1) the adviser was competent and possessed sufficient experience to justify reliance, (2) the taxpayer provided accurately all necessary information to the adviser, and (3) the taxpayer relied on the adviser's judgment in good faith.  *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).  Whether a taxpayer relies on an adviser and whether such reliance is reasonable depends upon all pertinent facts and circumstances.  Treas. Reg. § 1.6664-4(c)(1).

Petitioners acted reasonably with respect to attempting to ascertain their tax liabilities.  They retained Mr. May and eventually hired him as a full-time employee, indicating they were monitoring and responding to the business's accounting needs.  His education and work experience prove him to be sufficiently competent to justify relying on

**[\*27]** his advice. Mr. May testified that he exercised due diligence in procuring all records he needed and that petitioners were cooperative in that respect.

We have recognized in this context that NOL computations are complex, and the rules governing carrying them back and forward are not intuitive and are frequently altered by Congress. *See Patacsil v. Commissioner*, T.C. Memo. 2023-8, at \*18. Mr. May exercised his experience and judgment to provide tax and accounting advice to petitioners in his role of in-house accountant, including the calculation and claiming of NOL carryforward deductions for 2008 and 2009. Petitioners reasonably relied on Mr. May's advice and had no reason to question the position taken on the returns with respect to the NOLs. Under the facts herein, we find petitioners acted with reasonable cause and in good faith with respect to the underpayments and are not liable for the section 6662(a) penalties.

We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*